MAGWIRE, Appellant, v. TYLER et al., Respondents.*

1. A petition asserted an equitable right; the defendants filed their answer thereto; when the cause was called for trial, both plaintiff and defendants having announced themselves ready for the trial and hearing of the cause, the court ex mero motu dismissed the petition; held, that in thus dismissing the petition the court committed error.

2. In the case of a confirmation under act of Congress of March 3, 1807, where the confirmation is accompanied with the condition that the land be surveyed, if—the true location of the tract confirmed being in doubt—the legal representative of the confirmee appropriates the land as afterwards located and surveyed by the United States, and receives a patent therefor as thus located and surveyed, a person claiming the land confirmed under the confirmee as elsewhere located, by title acquired subsequent to the appropriation, can not dispute the propriety of the location as actually made. The legal representative of the confirmee, prior in point of time and of right, would have a prior right to assent to the location as made by the United States government; there being but one confirmation, one satisfaction in favor of the legal representatives of the confirmee exhausts the obligations of the government. (Per Scott, Judge.)

* RICHARDSON, Judge, having been of counsel, did not sit at the hearing of this case.—[REP.

3. In the case of a confirmation under act of Congress of March 3, 1807, where the confirmation is accompanied with the condition that the land confirmed should be surveyed, such survey, when made by the proper executive officers of the United States government, conclusively settles the question of the locality of the tract confirmed, and the courts, either of law or equity, can not locate the tract elsewhere. (Per NAPTON, Judge.)

## Appeal from St. Louis Land Court.

This was a suit in the nature of a bill in equity. The plaintiff in his petition asserts title in himself to a tract of four by four or sixteen arpens of land embraced within United States survey No. ——, for Louis Labeaume or his legal representatives ; and alleges substantially that on the 25th of June, 1794, Don Zenon Trudeau, lieutenant governor of Upper Louisiana, conceded to Joseph Brazeau a tract of four by twenty arpens; that on the 9th of May, 1798, said Brazeau, by deed of that date, conveyed the tract of land, thus conceded to him, to Louis Labeaume, reserving to himself four by four or sixteen arpens of the southern part of said concession; that said Brazeau continued to claim, possess and occupy the said tract of four by four arpens until he agreed to convey the same to Pierre Chouteau ; that after the making of said deed by Brazeau to Labeaume, Labeaume presented his petition to the lieutenant governor, stating in said petition in substance that he had purchased of Brazeau a parcel of land which had but a limited depth, and said Labeaume prayed that the lieutenant governor would " grant to him 360 arpens of land, including that which he had acquired from Brazeau— that is to say, twenty arpens in depth from the Mississippi, ascending the Rocky Branch, west quarter south, by sixteen arpens front along the Mississippi, to be taken from the descent of the road into the creek, which is the same front of the petitioner's land ;" that on or about February 15, 1799, the lieutenant governor acted upon said petition of said Labeaume and ordered that a survey should be made of the land petitioned for, and that he be put in possession thereof; that on or about April 10, 1799, the Spanish government caused a survey to be made by Don Antonio Soulard, acting

surveyor in the Spanish province of Upper Louisiana, for said Labeaume; which survey was intended and ordered to be made of the land that said Labeaume had asked for in his petition above mentioned; but the said surveyor Soulard, either by mistake or design, so made said survey as to include the whole of the four by four arpens of land which said Brazeau had reserved to himself in his said deed to Labeaume; that on or about September 22, 1810, the board of commissioners for the adjustment of land titles in the territory of Missouri, acting in pursuance of, and in conformity with, the laws of the United States in such cases provided, confirmed to Joseph Brazeau four arpens of the tract or parcel of land that was conceded to him as aforesaid, being the same four arpens reserved by Brazeau in his deed to Labeaume; that said commissioners, by the same act, confirmed 356 arpens to Labeaume;* that said commissioners on or about June 14, 1811,

---

* The following are the confirmations to Labeaume and Brazeau:

"September 3, 1806. The board met pursuant to adjournment. Present, the Hon. John B. C. Lucas and James L. Donaldson, Esq.

"The same [Louis Labeaume], claiming 374 arpens of land situate on the Mississippi, a distance of about two miles from the town of St. Louis, produces a concession, duly registered, from Zenon Trudeau, for four by twenty arpens, dated the 20th of June, 1794, and granted to one Joseph Brazeau; and another concession from said Zenon Trudeau to claimant for the said 374 arpens including the said four by twenty arpens, dated the 15th of February, 1799; a survey of the same taken the 20th of March and certified the 10th of April, 1799, together with a certificate by Zenon Trudeau of the sale of said four by twenty arpens by said Joseph Brazeau, reserving to himself four arpens in superficies; said certificate dated the 12th of May, 1798.

"Hyacinth St. Cir, being duly sworn, says, that the said Joseph Brazeau [obtained] the said tract of four by twenty arpens and cultivated the same in the years 1794–5–6; and, having sold the same to claimant, he did in the year 1797 put a tenant on the same, who actually cultivated it until the year 1799, when claimant moved on it; that he was then the head of a family, and did prior to and on the first day of October, 1800, actually inhabit and cultivate the same, and has continued on it to this day. The claimant abandoning his right to the aforesaid concession of four by twenty arpens and claiming immediately under the second—to-wit, that for the three hundred and seventy-four.

"The board reject the same, the said concession not being duly registered.

"The board adjourned till to-morrow, 9 o'clock, A. M. [Book No. 1, pages 515–7–9.]"

"Friday, September 22, 1810. Board met. Present, John B. C. Lucas, Clement B. Penrose, Frederick Bates, commissioners.

issued in favor of said Brazeau patent certificate No. 983 for said four arpens of ground, and ordered the same to be surveyed agreeably to the reserve in the deed of Brazeau to Labeaume; that Joseph Brazeau and wife, by deed dated July 26, 1816, conveyed the reservation of four by four arpens to Pierre Chouteau—in this deed it is recited that Brazeau had long before verbally sold said tract to said Chouteau; that in the month of November, 1817, Joseph C. Brown, deputy surveyor of the United States, by authority of the surveyor general of Illinois and Missouri, surveyed the said reservation; that said Brown, in his report of said survey, stated in substance and effect that he had surveyed two tracts in one†— the one confirmed to Louis Labeaume for 356 arpens— the other under Joseph Brazeau for four arpens—together 360 arpens, equal to 306¼ acres, beginning at the mouth of the branch, the south-east corner of Easton's tract; thence down the Mississippi river to a stone at the mouth of an old ditch, the lower corner on the river; thence westwardly, &c.; that by deed dated June 1, 1826, Pierre Chouteau and wife conveyed said reservation of four by four arpens to George F. Strother;‡ that by deed dated September 3, 1830, George

"Louis Labeaume, claiming 374 arpens [see Book No. 1, page 417]. The board confirm to Louis Labeaume three hundred and fifty-six arpens, and four arpens to Joseph Brazeau, and order the same to be surveyed agreeably to a concession from Zenon Trudeau to Louis Labeaume, and as respects the four arpens, agreeably to a reserve made in a sale from Joseph Brazeau to said Louis Labeaume, recorded in Book C, p. 339, of the recorder's office.

"Board adjourned till Wednesday next at 3 o'clock, P. M. John B. C. Lucas, Clement B. Penrose, Frederick Bates." [See Book No. 4, pp. 502–5–8.]

"Friday, June 14, 1811. Board met; present, John B. C. Lucas, Clement B. Penrose and Frederick Bates, commissioners.

"Louis Labeaume—Book No. 4, 505—survey at the expense of the United States. Board adjourned.

"Cert. 982 and 983. John B. C. Lucas, Frederick Bates and Clement B. Penrose." [See Book No. 5, pp. 183–4–5.]

† The following is an extract from the report of the survey by Brown: "Surveyed for Louis Labeaume two tracts in one—the one confirmed in his own name for 356 arpens—the other under Joseph Brazeau for four arpens—together 360 arpens, equal to 306¼ acres; beginning at the mouth of the branch, the south-east corner of Easton's tract, thence down the Mississippi river, bending therewith," &c.

‡ By this deed Chouteau conveyed to Strother the following tracts of land:

F. Strother and his wife conveyed said four by four arpens to John Mullanphy and John O'Fallon, in trust for the St. Louis Marine Railway Company ;§ that in 1840 George F. Strother departed this life intestate ; that Alexander Hamilton was appointed administrator of his estate ; that by deed dated June 4, 1846, under an order of the probate court, said Hamilton conveyed said tract of four by four arpens to John

"All that tract or parcel of land granted to the said Pierre Chouteau in October, 1799, by Carlos Dehault Delassus, Spanish commandant, beginning at Roy's line, running north to Labeaume's south line, and extending from the river to the common field lots west, it being intended to convey to the said George F. Strother, his heirs and assigns, all the land contained within the said concession, except that heretofore sold by the said Pierre Chouteau, according to his several contracts, to be limited by the metes and bounds limited and fixed by the intention of the parties at the time of contracting. And one other tract of land containing four arpens, running on the river, and running back four arpens, making sixteen arpens, lying between the north line of the first described tract of land and the south boundary of the tract of land sold by Joseph Brazeau to Labeaume—said sixteen arpens being a tract or parcel of land confirmed to Joseph Brazeau and sold and conveyed by Joseph Brazeau to Pierre Chouteau, together with all the houses and appurtenances thereunto annexed. To have and to hold the said several tracts or parcels [pieces] of land with the tenements so intended and bargained to be sold, with every part and parcel thereof, with the rights and appurtenances, unto the said George F. Strother, his heirs and assigns forever; and the said Pierre Chouteau and Bridget his wife do hereby warrant the same free from the claim of themselves and their heirs and all persons claiming under them, except those who now have deeds recorded in the clerk's office of St. Louis, according to the modification of said claims aforesaid described. In witness whereof," &c.

§ By this deed two tracts, described as follows, were conveyed : "All that tract or parcel of land granted to Pierre Chouteau in October, 1799, by Carlos Dehault Delassus, Spanish commandant, beginning at Roy's line, running north to Labeaume's south line, and extending from the river to the common field lots west, except that heretofore conveyed by the said Pierre Chouteau according to his several contracts, to be limited and fixed by the intention of the parties at the period of contracting ; and also with a reservation of a parcel of the said land contracted to be sold by the said George F. Strother to Martin Thomas, as surveyed as follows, &c. [Here follows a description of a tract of about six acres, located south of Labeaume's ditch.] Also another tract of land containing four arpens, running on the river, and four arpens back, making sixteen arpens, lying between the north line of the first above described tract of land and the southern boundary line of the tract of land sold by Joseph Brazeau to Louis Labeaume, and being part of the same tracts, pieces and parcels of land which the said George F. Strother purchased from Pierre Chouteau and Bridget his wife, by deed bearing date June 1st, 1826," &c.

Magwire, plaintiff in this suit; that the St. Louis Marine Railway company, through its surviving trustee, John O'Fallon, by deed dated January 2, 1852, conveyed said reservation of sixteen arpens to John Magwire, plaintiff in this suit;|| that by virtue of the confirmation under the said act of Congress of March 3, 1807, the legal representative of Brazeau became the owner in equity of said sixteen arpens of land reserved by said Brazeau in his deed to Labeaume; that on the 25th of March, 1852, a patent issued from the General Land Office of the United States, under the direction of the Secretary of the Interior, signed by the President of the United States, which patent was so worded as to embrace said reservation of four by four arpens confirmed to Brazeau; that said patent was issued by the error or mistake of the Secretary of the Interior, and in violation of the right of the plaintiff and contrary to law; that in 1796 or 1797, before the deed from Brazeau to Labeaume, Labeaume caused a ditch to be dug along the south end of the tract of four by twenty arpens, then belonging to Brazeau; that this ditch was dug for the purpose of a drain; that about the year 1803 Labeaume withdrew his fence from the line of said ditch and so located it as to exclude the four by four arpens; that the true and proper location of the reservation of four by four arpens is north of said ditch called Labeaume's ditch; that in 1816 Labeaume conveyed to William Chambers the tract acquired by him . from Brazeau and the tract conceded to himself by the Spanish government; that Chambers afterwards sold and conveyed

---

|| By this deed the Marine Railway company conveyed to John Magwire "the land belonging to or claimed by the St. Louis Marine Railway company in the city of St. Louis, north of the ditch called Labeaume's ditch." The deed recites the following resolution passed at a meeting of the stockholders of the said company: "Resolved, That the land belonging to or claimed by the St. Louis Marine Railway company north of what is known as Labeaume's ditch, being four arpens in front on the river, and four arpens in depth, and bounded east by the Mississippi river, and south by said ditch of Labeaume, and containing sixteen arpens, be conveyed to John Magwire; and that John O'Fallon, surviving trustee, who holds the legal title to said land, be and he is hereby directed to make said conveyance to said Magwire, and deliver the same."

an undivided interest of two-thirds to William Christy and Thomas Wright; that it was the said Chambers, Christy and Wright, and persons claiming under them, who first set up a claim to said reservation of sixteen arpens; that in the year 1823 Pierre Chouteau instituted an action of ejectment against Christy to recover possession of said reservation; that he was compelled to submit to a nonsuit in consequence of erroneous rulings to the jury; that in 1827 Strother instituted an action of ejectment against Christy, and was forced to take a nonsuit; that said reservation of sixteen arpens, from 1799 or 1800 until about 1827, lay open and unenclosed, without fences or buildings, at which time a small building was erected on said land by one Lapsley; that Lapsley vacated said building in 1831, from which time until 1843 the land remained vacant and unoccupied; that Chambers, in 1843, erected a small building on said reservation; that in 1852 the plaintiff, Magwire, instituted several suits in ejectment in the St. Louis Court of Common Pleas—Magwire v. Vice, Magwire v. Cochran, &c., &c.—to recover possession of parts of said reservation; that in the suit against Vice a verdict and judgment was rendered against the plaintiff, Magwire, on the ground that he had not the legal title to the land sued for, and was therefore not entitled to the possession thereof; that this judgment was affirmed on appeal to the Supreme Court of Missouri; that plaintiff, Magwire, in 1852, conveyed a lot embraced in said reservation of four by four arpens to one West, who instituted an ejectment suit therefor in the Circuit Court of the United States against one Joseph Cochran; that in this suit verdict and judgment were rendered in favor of the defendant; that this judgment was affirmed by the Supreme Court of the United States on the ground that at the time of the institution of the suit the plaintiff, West, had not the legal title to the land sued for; that plaintiff in the present suit, Magwire, has ever since his purchase of the four by four arpens, by all means in his power, by actions of ejectment and otherwise, been endeavoring to obtain possession of said sixteen arpens, but he has

been hindered and prevented from holding possession by reason of his not having the legal title; that sometime in the year 1846 plaintiff entered peaceably into the possession of a portion of said tract, claiming the whole, and so continued in possession until 1849, when some of the defendants, with force and violence, expelled plaintiff's tenants, whereupon plaintiff's tenants (Carlisle & Keyser) instituted an action for a forcible entry and detainer, in which action a recovery was had and restitution awarded; that West, in January, 1855, reconveyed to plaintiff the lot conveyed by plaintiff to him in 1832; that in 1832 or 1833 the representatives and assignees made an attempt to obtain a patent certificate upon the survey of Brown, of November, 1817, with the design and intent to procure a patent from the government of the United States which would include the four by four arpens reserved by Brazeau; that the recorder of land titles refused to issue such patent certificate on the ground that the survey of Brown, of 1817, improperly included the reservation by Brazeau; that the surveyor general ordered a survey (No. 2974) of the confirmation to Labeaume, so as to include only 356 arpens; that Brown made such re-survey, leaving out or throwing off a strip on the west; that Chambers as assignee of Labeaume obtained, December 21, 1837, from the recorder of land titles a patent certificate, No. 1151, on said survey, No. 2974; that this certificate was issued upon the faith of representations made by Chambers that said survey No. 2974 did not include the reservation of four by four arpens; that said recorder soon after ascertained that said Chambers had misrepresented the facts in respect to said survey, and that said survey did include said reservation; that said certificate was obtained by fraud and misrepresentations of said Chambers, &c., &c. [The petition then proceeds to set forth the action of the recorder of land titles, of the surveyor general of Missouri and Illinois, of the Commissioner of the General Land Office, and of the Secretary of the Interior; that under the decision of the Secretary of the Interior, a survey of the confirmation to Labeaume was made, which is numbered

3333, and includes the land in controversy; that this survey was approved February 25, 1852, and bounds the confirmation to Labeaume, on the south, by Labeaume's ditch; that under the authority and by virtue of instructions from the Secretary of the Interior, the confirmation of the Brazeau reservation was located south of Labeaume's ditch. This survey, numbered 3332, was approved February 26, 1852. The petition states that patent certificates and patents were issued on said surveys to Labeaume or his legal representatives, and to Brazeau or his legal representatives; that said surveys were made without authority of law and are erroneous—survey No. 3333, in that it includes the reservation of four by four arpens north of Labeaume's ditch—survey No. 3332, in that it locates the said reservation south of said ditch; that the land south of said ditch was never granted or confirmed to said Brazeau, nor was it ever reserved by him; that defendants were active in procuring said surveys to be made; that " the issuing of the patent certificates and patents thereon, as before stated, were procured and obtained by secret and fraudulent misrepresentations of the defendants, or some of them, by which the said action of the said Secretary of the Interior was procured;" that plaintiff has always protested against the action of the Secretary of the Interior and against said surveys and patents. The petition then sets forth the portions of said tract held by the several defendants.]

The following is the prayer of the petition: " *First*, that this court, by its judgment and decree, will declare the said survey No. 3333 to be void and of no effect, and to vacate and set aside the same in so far as the same may or shall affect said four by four arpens of land reserved by said Brazeau; *second*, that this court, by its judgment and decree, will declare the said patent certificate No. 1249, issued thereon, to be void and of no effect, and to vacate and set aside the same in so far as the same may or shall affect the said four by four arpens of land; *third*, that this court, by its judgment and decree, will declare the patent aforesaid, issued upon said patent certificate No. 1249 to Louis Labeaume or

his legal representatives, to be void and of no effect, and to set aside the same in so far as the same may or shall affect said four by four arpens of land; *fourth*, that this court, by its judgment and decree, will declare the said survey No. 3332 to be void and of no effect, and to vacate and set aside the same; *fifth*, that this court, by its judgment and decree, will declare the said patent certificate No. 1250, issued on said last mentioned survey, to be void and of no effect, and to vacate and set aside the same; *sixth*, that this court, by its judgment and decree, will declare that the patent issued on said patent certificate No. 1250 to Joseph Brazeau, or his legal representatives, to be void and of no effect, and to set aside the same; *seventh*, that this court, by its judgment and decree, divest out of the defendants, or out of all those who claim to have or hold any title or right in or to said four arpens (or sixteen arpens in superficies) that said Joseph Brazeau reserved to himself in his said sale and deed to said Louis Labeaume, and that the right or interest held or claimed by the defendants, or either of them, be, by the judgment and decree of this court, vested in the plaintiff; *eighth*, that by the judgment and decree of this court the defendants be required to surrender and yield possession of said four by four arpens of land, or of so much and such part or parts thereof as they or either of them may claim, possess and occupy, to the plaintiff, and that he, the plaintiff, may, by the judgment, order and process of this court, be put in possession of said land ; *ninth*, that by the judgment and decree of this court the defendants may be required to account for and pay over to the plaintiff all the rents, profits, advantages, &c.; *tenth*, that the defendants be adjudged to pay plaintiff damages, &c.; *eleventh*, that by the judgment, decree and restraining order of this court the defendants or their agents may be enjoined and restrained from committing waste and injury, &c.; *twelfth*, that by the order, &c., the plaintiff have such other and further relief," &c.

The defendants filed an answer to the above petition. When the cause was called for trial, "the plaintiff appeared

by his counsel and the defendants also appeared by their counsel, both parties having announced themselves ready for the trial and hearing of the case; whereupon the court, after having examined the petition and answer, *ex mero motu* ordered the plaintiff's petition to be dismissed."

The following is the final judgment rendered by the court: " Now at this day come said parties by their respective attorneys, and thereupon come also the jury heretofore sworn in this cause; thereupon the trial progressed, and the court, having heard and examined the plaintiff's petition, and being fully advised of and concerning the premises, is of opinion that the plaintiff's petition does not state facts sufficient to show a cause of action against the defendants or either of them, nor has the plaintiff any right to have the relief prayed for in said petition; it is therefore ordered, adjudged and decreed by the court that the plaintiff's petition be and the same is dismissed without prejudice to the rights of plaintiff; and it is further ordered, adjudged and decreed by the court that the plaintiff pay the costs," &c.

*Krum & Harding*, *Glover*, *Gamble*, and *Geyer*, for appellant.

I. The dismissal of the petition *ex mero motu* by the court below was tantamount to a decision upon demurrer to the whole petition; and although the defendants put in their answer, yet, for the purposes of determining the question of error in the decision below, the facts charged in the petition are to be considered as admitted.

II. The legal title to the premises claimed by the appellant upon the facts stated in the petition, and according to the course of the decisions of the Supreme Court of the United States, must be admitted to be vested in Louis Labeaume or his legal representatives; but the equitable title or claim of the representatives of *Joseph Brazeau* follows the land in the hands of the present claimants. This proposition is maintained on the following grounds: 1. That the tract of land of 374 arpens confirmed to Louis Labeaume, and surveyed

by Soulard under authority of the Spanish government, included the four by twenty arpens conceded to Brazeau, and as well that portion he reserved as that he conveyed to Labeaume.    2. That the surveys made by authority of the United States of the confirmation of 656 arpens to Labeaume, and 16 arpens to Brazeau, severed the whole from the public domain.    3. That the confirmations respectively to Labeaume and Brazeau having been severed from the public domain by the authorized act of the government of the United States, the rights of said confirmees respectively attached to the land, each to his own share or portion, from the date of the return of the official survey, and those rights were according to said confirmations.    4. That the government of the United States, from the time of the survey, had no longer any interest in the land embraced in said confirmations; and that it belonged to the judicial and not to the executive department of the government to settle conflicts between the confirmees.    5. That the rights of Brazeau or his representatives became fixed by the confirmation in his favor, and that right became definite and certain when the survey was made severing the land from the public domain.    6. That the patent issued by the executive department of the government to Labeaume, including all the land embraced in the confirmations to him and to Brazeau, does not have the effect to defeat the equities of the latter.    7. That the patentee holds the land in trust for the owners of the equitable interests herein.

III. The right of the Secretary of the Interior, or of any other officer of the executive department, to determine the rights of the claimants to the land confirmed to them respectively is denied.    No such power belongs to the executive. The power claimed for the Secretary of the Interior, and which he assumed to exercise in this instance by directing the surveys to be made in the manner he did, and which was in effect to adjudicate upon the rights of the claimants, belongs to the judiciary; and in so far as the action of the Secretary of the Interior transcended his powers it has no force.

IV. The location of the extended grant to Labeaume is not questioned; but the applicant claims that Brazeau was entitled to sixteen arpens (the quantity he reserved in his deed to Labeaume) within that extended grant, for the extended grant embraced the whole of the four by twenty arpens originally conceded to Brazeau. The confirmation to Brazeau was for sixteen arpens within the extended grant to Labeaume, which is apparent on the face of the act of confirmation itself. The survey made in 1817 of "two tracts in one," and which was designed to designate the exterior boundaries of the larger tract, and to sever this land confirmed from the public domain, more than any thing else, does not conflict with this view of the case.

V. This is not a case of rights acquired subsequent to the confirmation or issuing of the patent. It can not be said therefore that the patent appropriates the land included within it to the exclusion of Brazeau or his legal representatives.

*Shepley* and *B. A. Hill*, for respondents.

I. Even in admitting that the present case is not already decided by the case of West v. Cochran on the same subject matter and other subsequent decisions of the Supreme Court of the United States, yet a court of equity possesses no such power as is claimed for it in this case. It is asking the court to vacate one patent and to give title to land embraced within another to those who claim the land for which the vacated patent was issued. The utmost length that courts of equity have gone is, that when recognizing the validity of the patent they transfer the legal title to it from him in whom it is vested to another whom they deem equitably entitled to it. The party asking relief had title to that particular land, or he had title to none. In all the cases there is no question arising of identity of location as between two tracts of land. The question arising in this case is simply a matter of location, not of right. The plaintiff claims not *through* the patent, but antagonistic to it. If Magwire had stood in the position of asserting his rights as being the person equitably entitled

to the benefit of the confirmation of the tract conceded to La-beaume, and that by fraud another person had caused the patent for that confirmation to issue to him instead of to Magwire, to whom it ought in equity to issue, he would have presented a case similar to those upon which courts of equity have acted. (4 Louis. 443; Stephenson v. Smith, 7 Mo. 610; 8 Pet. 75: 9 Cranch, 164; 2 Bibb, 484; 6 B. Mon. 290; 6 Dana, 128.) There is no question of prior right. The titles of the two parties are of equal equity, of equal age and value, and it is a pure question of location. 2. The relief sought can not be given without vacating a patent of the United States, which the court has no power to do. (9 Mo. 758.) This can be done only upon the relation of the attorney general of the United States. The representatives of Brazeau can not have two tracts of four by four arpens at the same time. 3. But it is not alone the patents that are sought to be operated upon; for, in order to do this, it is necessary to annul the survey for Brazeau, and to vacate so much of the survey of Labeaume as interferes with the location sought to be made for Brazeau. It is an attempt by bill in chancery to locate and survey a confirmation for the reason that the United States, whose duty it was to survey it, had not surveyed it in the right place. 4. But it will be said that by the confirmation the title passed out of the United States, and that there was only a mere ministerial act to be performed, and that a court could compel the proper officer of the United States to perform it by mandamus. Even admitting this, it does not help the plaintiff. The court would have no power to tell the surveyor general how to survey it. That is reserved to the United States, and they are to exercise it in their best discretion. 5. By his own showing plaintiff selected his forum for contesting this whole matter, that of the Land Department of the government. 6. The result is that, in carrying out the principle contended for, in every case of a survey by the United States of a confirmation, when the party for whose benefit it is made thinks it should be surveyed differently, he has a right to come into a court of equi-

ty and ask the court to give them the land either owned by the United States or surveyed and patented to other persons.

II. The decision of the Supreme Court of the United States in West v. Cochran, 17 How. 403, completely covers this case. See also Stanford v. Taylor, 18 Howard, 410; Kissell v. Public Schools, 18 How. 19.

III. But the plaintiff says that he has never accepted the patent and survey. To this it is answered that plaintiff has no power to reject it, as he does not pretend to own the land covered by the survey and patent. He would have no right to reject the survey and patent even if the rights of others would not be affected by his action.

Scott, Judge. This is a proceeding in equity, and the plaintiff's right to a recovery is based on the pretension that in justice and good conscience he is entitled to the relief sought from the defendants. On the 19th of May, 1798, Joseph Brazeau, in a deed to Louis Labeaume, reserved to himself four by four arpens of a concession which was thereby conveyed from Brazeau to Labeaume. This reservation was also witnessed by Lieutenant Governor Trudeau, in a certificate dated the 12th day of May of the same year, endorsed on the concession for the purpose of authenticating the transfer from Brazeau to Labeaume. By the board of commissioners acting under the law of Congress of the 3d of March, 1807, respecting land claims in Louisiana territory, this reservation was confirmed to Joseph Brazeau or his legal representatives, as is maintained by the plaintiff. It is conceded on all sides that there was but one such reservation, and that the government of the United States was under obligation to make but one satisfaction of the claim or reservation of Brazeau. If those entitled by law to that reservation have had it located and have made an appropriation of it as located, there can be no valid claim to that reservation existing in any other person, nor can it be of any importance whether the location of the claim was made north or south of the Labeaume ditch. If those entitled to the claim are

satisfied with the location as it has been made, it is not for third persons, claiming by a subsequent conveyance, to object to that location, and insist on its being placed in some other locality.

By a deed of July 26th, 1816, Brazeau having conveyed his reservation to Pierre Chouteau, Chouteau, by a deed of June 1st, 1826, conveyed the same to George F. Strother. This latter deed, by its terms, beyond all doubt, included the reservation of four by four arpens originally belonging to Brazeau, and by him conveyed to Chouteau. Strother, by a deed of September 3d, 1830, conveyed to John O'Fallon and John Mullanphy, in trust for the St. Louis Marine Railway company, the reservation as it was conveyed to him by Chouteau, reference being made to Chouteau's deed. It will not be contended, it is presumed, that the deed from Strother to the trustees of the Marine Railway company did not convey the reservation in as ample a manner as it was conveyed by Chouteau to Strother. The answer denies that the title of the Marine Railway company passed to the plaintiff by virtue of the deed of January 2d, 1852; and as it was agreed on the argument that any state of facts might be assumed consistent with the pleadings which would show that the plaintiff is not entitled to recover, we will take it that the Marine Railway company, without any regard to its location, conveyed away the reservation acquired from Strother by his deed of September 3d, 1830. Now, if afterwards that company conveyed its interest in the reservation, by the description of the land north of the ditch called Labeaume's ditch, to the plaintiff, then he took it subject to the preëxisting rights of the company's alienees. Those alienees taking the reservation wherever it might be located, they or their assigns would have a right prior to that of the plaintiff to assent to the location; and if they should have appropriated the land as located and patented, there could be no right in the plaintiff to have it surveyed in any other locality. Indeed, if the reservation was conveyed by the Marine Railway company to its alienees as it was received from Strother, it is not easy to see how the

plaintiff could derive any right, title or interest by a subsequent conveyance. If the conveyance to the plaintiff had been in as ample a manner as those to the prior alienees, he could not derive any title from it, and it can not be perceived how his situation is bettered by taking a deed for the company's land north of the Labeaume ditch. It will not be contended that the company's deed to the plaintiff was designed in any way to affect the rights of its prior alienees in the event of the reservation being patented south of the ditch.

How, then, does the case stand ? They to whom the reservation rightfully belonged have appropriated it, and its survey and patent include the land as appropriated. Survey No. 3333 locates the reservation south of the ditch, and the patent on that survey conveys the land to Brazeau's representatives. Now as the representatives of Brazeau, prior in point of time and of right, have appropriated the land as located by the United States, how can there be any right in any other person to have that land located a second time ? Such pretension can only find support in the idea that there were two reservations belonging to Brazeau—one north and one south of the ditch. As there was but one reservation, and as the government of the United States has satisfied its obligations to the legal representatives of that claim, there can not exist, in law or equity, any claim or right in any other person arising out of a conveyance subsequent to those under which the land had been previously appropriated.

We do not see what the deed of the administrator of Strother has to do in this controversy. Even admitting it was available for any purpose, we do not consider that there is any necessity for inquiring how far the deed from the plaintiff to Bogy would operate as an estoppel against his right of recovery in this action. The existence of this deed is averred in the answer.

I have not placed my opinion on the ground maintained by Judge Napton. Deference to the intimation of the Supreme Court of the United States, when this case was before it on a writ of error on its law side, disinclines me to enter

on that question. It is obvious that if such an objection is tenable, unless the general government will issue a patent to each claimant of the same tract of land, the action of its officers in making a survey will be conclusive on the courts both at law and in equity. On the other hand, if the intimation of the court is carried out, then, by a change of the form of the action, the whole doctrine of the conclusiveness of surveys will be evaded.

. We do not see how the action of the court below in dismissing the bill under the circumstances can be sustained. An answer to the petition was filed. If the parties had so wished, the answer might have been withdrawn and a demurrer entered. But that was not done. There was no trial but on the petition and answer. The bill was dismissed; no facts were found. It does not appear why the petition was dismissed. The judgment will be reversed, and the cause remanded.

NAPTON, Judge. It was determined in the case of West v. Cochran, 17 How. 414, that in relation to confirmations under the act of 1807, where the claim was uncertain, and the confirmation is accompanied with the condition that the land should be surveyed, such survey is to be made under the authority of the United States by her officers; and that the location is not a question for the investigation of the judiciary. This principle is distinctly declared in the instructions of the judge who tried the case on the circuit and who subsequently delivered the opinion of the court at Washington. The principle is moreover applied to the very matter now in controversy here, as will be seen by the instructions, which are these: " We are of opinion that the United States reserved the power to locate, by survey, the land *confirmed to Brazeau,* and by such survey to separate it from the public lands and from the lands claimed by others, and to issue a patent therefor, as was done in this instance; that this reserved power was vested in the executive department, whose acts, in this instance, *bound Brazeau and others claim-*

*ing under him;* nor can they extend their claim and recover land beyond the boundaries described in the patent to Brazeau or his legal representatives." But this is the very matter now proposed to be inquired into by Brazeau's legal representatives, to-wit, that the fact of *where* this land is shall be investigated. It is true that one of the judges of the Supreme Court declared it to be understood, in the decision of West v. Cochran, that the equities of the parties were still open ; but if the grounds upon which the ejectment was determined, both on the circuit and at Washington, are to be understood as the basis of the decision and judgment, it is not perceived how this declaration of Mr. Justice McLean can help the plaintiff's case.

If the assertion in this bill, that Brazeau's entire concession of four by twenty arpens and his confirmation of four by four arpens lay north of Labeaume's ditch, is to be assumed as a fact, the case might present a different aspect; but this assertion is coupled with an exposition of the title papers, with the concessions to Labeaume and Brazeau, the survey of Soulard, the confirmations—in short, with a complete history of the case. The confirmation to Brazeau produced is the identical confirmation which the Supreme Court passed upon in the case of West v. Cochran, and which they declared only operated upon land which the United States executive should subsequently designate. " Until the survey was made" the court say " the plaintiff's title attached to no land, nor could a *court of justice* ascertain its boundaries." It strikes me that this is a very distinct enunciation, that the surveying department of the federal government settles the question of location, and that the courts have nothing to do with it. The principle is just as applicable in a court of equity as of law.

There is no doubt that where a complete title has emanated from the federal government to a specific tract of land, and an equity attaches to that land in behalf of some other person than the patentee, a court of justice, either state or federal, may enforce such equity, and transfer to its owner

the legal title. This, however, proceeds upon the assumption that there is an equity against the United States to a specific tract of land. It can not be doubted that Brazeau's confirmation was at least an equity ; but to what ? To what specific land did Brazeau's equity attach ? To the land within the confirmation, of course. But what land is within the confirmation, and who is to determine it ? The answer settles this controversy. If it is a question of fact to be investigated and determined by courts of justice, the bill in this case is not subject to demurrer ; but if, as the Supreme Court said in West v. Cochran, it is a question to be determined by the executive department of the United States, then Brazeau's equity is to the land which they designate, and not to that which we might determine. No doubt the acts of executive officers, federal or state, whether President or surveyor, if contrary to law, are void ; and so any court of justice, federal or state, would decide. But the Supreme Court declares that the law itself, the act of 1807, has entrusted the surveyor with authority to determine where this confirmation is, and that until a survey is made the confirmee has no standing in court. If injustice is done him, it is by the political sovereignty, and to redress such injuries is not within the province of courts.

This controversy is obviously purely one of locality. Pursuing it through all its ramifications, and looking at it in all its diversified shapes, it still resolves itself at last into this, and nothing else. There is no dispute that Brazeau had a confirmation; there is no dispute that this gave him at least an equitable, if not (as was once supposed) a legal, title ; there is no dispute that a court of justice, either state or federal, which has jurisdiction, will enforce this title ; but the dispute is, where is the land confirmed ? Who is to decide this ? I am laboring under a singular delusion if I am mistaken in saying that the Supreme Court of the United States have deliberately adjudged, in reference to this very case, that the United States surveyor is alone to determine this question.

That the case of West v. Cochran is not misunderstood is

seen by what the same court have since said in Kissell v. The Public Schools, 18 How. 19. " Our opinion is that the school lands were in the condition of Spanish claims after confirmation by the United States, without having established and conclusive boundaries made by public authority, and which claims depended for their specific identity on surveys to be executed by the government. The case of West v. Cochran lays down the *dividing line between the executive and judicial powers* in such cases, to-wit: that until a designation, accompanied by a survey or description, was made by the surveyor general, the title attached to no land, *nor had a court of justice jurisdiction to ascertain its boundaries.*" In Stanford v. Taylor, 18 How. 412, the Supreme Court say : " Where the claim has no certain limits, and the judgment of confirmation carries along with it the condition that the land shall be surveyed and severed from the public domain and the land of others, there it is not open to controversy that the title attaches to no land ; nor has a *court of justice* any authority in law to ascertain and establish its boundaries, this being reserved to the *executive department.*"

These cases do not proceed upon any distinctions between legal and equitable titles, or legal and equitable remedies. They are based upon a division line between the executive and judiciary departments, and assert that the latter have no jurisdiction of this question of location, which Congress have assigned to the former in certain enumerated cases, and that this is one of the cases referred to.

The entire scope of this bill is simply to ask the court to locate the Brazeau reservation within the lines of a tract confirmed to Labeaume, and to which Labeaume has a survey and patent. The whole argument to support this application is founded on the assumption that Brazeau's confirmation is to a *special tract* of land, and this specific tract of land lies within Brazeau's patent. But it has been authoritatively decided that Brazeau's confirmation was not specific, but was merely to such lands as the government surveyor should point out. The surveyor has determined its locality, and

that is not at the place where the plaintiff insists it ought to be. He is then without any equitable title to any specific tract if he declines to recognize the survey of the government; and if justice has been done through mistake or fraud, this is not the forum, or this proceeding the remedy, by which it can be corrected. If this court can now declare to him that his land is within Labeaume's survey, and is not where the government has located it, we must do so upon the ground that his confirmation gave him an equitable title to a specific piece of ground—one that could be located by the courts without the aid of surveyors; and consequently that any location of such tract by a government surveyor would merely be evidence of its locality, the propriety of which would be for the decision of courts of justice as in ordinary surveys of complete titles. But this is distinctly at variance with my understanding of the opinion of the Supreme Court of the United States in relation to this identical confirmation.

Upon a point of practice it is agreed that the judgment be reversed.