MAGWIRE, Appellant, v. TYLER et al., Respondents.

1. In the case of a confirmation under the act of Congress of March 3, 1807, where the confirmation is accompanied with the condition that the land confirmed should be surveyed, such survey, when made by the proper executive officers of the United States government, conclusively settles the question of the locality of the tract confirmed, and the courts of equity as well as law can not locate the tract elsewhere.

*Appeal from St. Louis Land Court.*

This case has heretofore been before the supreme court. The decision of the court is reported in 25 Mo. 484. The

facts of the case as bearing upon the decision of the court are sufficiently set forth in the said report in 25 Mo. 484. It is deemed unnecessary to set them forth again.

*Krum & Harding, Glover & Richardson,* and *L. V. Bogy,* for appellant.

I. The motion for a review of the finding of the court presents the material questions involved in this case. Among the facts found, which are material and are not objected to by the plaintiff, are the following: That in 1794 the Spanish government granted four by twenty arpens of land to Joseph Brazeau, as stated and claimed in plaintiff's petition; that Brazeau took possession of the land so granted to him about the time of said grant; that Brazeau, in 1798, sold to Labeaume said four by twenty arpens, excepting four by four arpens in the south-east part, which the said Brazeau reserved, as claimed in the petition; that said four by four arpens were confirmed to said Brazeau in 1810 to be surveyed; that said four by four arpens confirmed as aforesaid to Brazeau were surveyed in 1817, which survey was duly returned and approved; that the plaintiff has acquired the title to said four by four arpens by regular mesne conveyances under Brazeau; that when the patent was issued to Labeaume's representatives, they had notice of plaintiff's claim to the land reserved by said Brazeau in his deed to Labeaume. The plaintiff in his motion for a review asked the court to find, among other facts, the following: That the survey made in 1817 of the land confirmed to Labeaume was so made by the surveyor as to include the four by four arpens confirmed to Brazeau; that the said four by four arpens, confirmed and surveyed as aforesaid, are situate north of Labeaume's "south ditch," and are a part of the four by twenty arpens conceded to Brazeau in 1794 by the Spanish government; that the said four by four arpens confirmed to Brazeau are included within the description or outboundaries of the land mentioned in the patent issued to Labeaume's representatives; that the defendants claim and are possessed of the said four by four

arpens; and that they so claim and possess under and in virtue of said patent to Labeaume's representatives. The evidence also proved that the patent issued to Brazeau's representatives in 1852 was recalled or cancelled before the trial in this case. If these facts had been included in the finding the plaintiff would have been entitled to the relief and judgment prayed for in his petition. The court erred in refusing to find them. The evidence abundantly proved them.

II. The *legal* title must be admitted to be in Louis Labeaume or his legal representatives. The *equitable* or claim of the representatives of Brazeau followed the land in the hands of the present claimants under the patent to Labeaume. The tract of three hundred and seventy-four arpens conceded to Labeaume and surveyed by Soulard under authority of the Spanish government included the four by twenty arpens, as well that portion reserved by Brazeau as that he conveyed to Labeaume. The United States surveys made in 1817 of the confirmations respectively of three hundred and fifty-six arpens to Labeaume and sixteen arpens to Brazeau, severed the whole from the public domain and located the land in both confirmations. The confirmations having been thus located and severed from the public domain by the authorized act of the government of the United States, the rights of said confirmees respectively attached to the land, each to his own share or portion from the date of the return of the official survey; and said rights were according to said confirmations and surveys. The government of the United States from the time of the survey in 1817 had no longer any control in respect to the location of the land embraced in said confirmations, and it belonged to the judicial and not to the executive department of the government to settle conflicts between the confirmees or their legal representatives. The rights of Brazeau or his legal representatives became fixed by the confirmation in his favor, and the right became definite and certain in the matter of the location of the land when the survey was made in 1817. That the patent issued to Labeaume included all the land

embraced in the confirmations to him and Brazeau does not have the effect to defeat the equities of the latter. The patentee holds in trust for the owners of the equitable interest. (2 Johns. Ch. 405; 9 Cranch, 164; 11 How. 567; 7 Mo. 610.) Brazeau was entitled to sixteen arpens within the extended grant to Labeaume. This is apparent on the face of the act of confirmation itself. From the survey in 1817 of the "two tracts in one," plats of the respective tracts could have been constructed, and patent certificates to the respective confirmees could have been made out and patents issued. By the survey in 1817, the confirmation to Brazeau attached to the land so surveyed. (West v. Cochran, 17 How. 415; Carondelet v. McPherson, 20 Mo. 203.)

III. Neither the Secretary of the Interior, nor any other officer of the executive department of the government, had any right—after the survey of 1817 was returned and recorded—to determine the rights of the claimants. That right belongs to the judiciary. The survey or retracing of the lines, made by order of the Secretary of the Interior in 1852, can not affect either party unless assented to, and this Brazeau's representatives refused to do. (20 Mo. 205.)

IV. The plaintiff is not barred by laches; nor is this a stale demand. From the year 1823 there have been continued efforts on the part of Brazeau's representatives to recover the land in controversy. It was not till 1852 that Labeaume's representatives got the patent in question. The patent was obtained in the very midst of this controversy. Labeaume's representatives hold the legal title in trust for Brazeau's representatives.

V. The court finds that the four by four arpens confirmed to Brazeau are situate south of Labeaume's south ditch, and that said ditch, at the time of Soulard's survey in 1803, was recognized by all the proprietors as Labeaume's south line, and that possession was claimed and held with such recognition from the time of said survey in 1803 until 1823. The evidence does not warrant the finding of these facts. This south ditch of Labeaume was his south line for a part of his

14—VOL. XXX.

concession, but not the whole distance along the south of his concession. Brazeau' either had no land confirmed to him, or that which was confirmed is a part of the original concession of four by twenty arpens conceded. The whole of this was north of the ditch.

*B. A. Hill* and *Shepley*, for respondents.

I. The case as now presented raises the same questions discussed and decided when the case was here before. (See 25 Mo. 484.) The confirmation to Brazeau was void, no notice having been filed by him or his vendee Chouteau. If the claim be not void for want of notice, yet it can not operate as a grant of the premises in controversy by force of the acts of 1805 and 1807. Brazeau had no estate or claim, and no possession. (Gilb. Ten. 75 ; 2 Co. Inst. 516, 295.) The confirmation to Labeaume is express, and he had the possession to support it. The estate of the confirmee Labeaume originated under the act of 1805. He had a warrant or order of survey, and a survey by Soulard in 1799 of the identical premises included within the Labeaume patent. He was the head of a family and in actual possession in October, 1800, and December 20, 1803. The survey under the Spanish law was the authentic act upon which the grant was made, and proves itself as a record. The commissioners of the United States had no power to make a new survey of the Labeaume tract after confirmation. The Soulard survey had been filed with the proper register and recorder, and appeared of record on the public archives of said territory of Louisiana. The commissioners had the power to direct a *resurvey*, and in such case the lines of Soulard's survey should have been retraced. This order of survey must be regarded as an order of resurvey. The government of the United States, in 1852, made the resurvey pursuant to the act of Congress of 1807, and the patent issued thereon. The Spanish survey of Soulard was conclusive as soon as the confirmation was made, and the Labeaume tract was located thereby. (Ott v. Soulard, 9 Mo. 588.) The surveys of 1817, 1833 and 1837, by

the surveyors general of the United States, of the Labeaume tract, were not authorized by the act of Congress under which the confirmation was made, and were void. Each of these surveys has, moreover, been disapproved by the executive department of the government. (See West v. Cochran, 17 How. 403.) The cases of West v. Cochran and Staniford v. Taylor do not hold that a confirmation under the act of 1807, upon an authenticated plat of survey filed with the recorder and appearing of record, is not effectual to vest the title in the confirmee. The scope of these decisions is limited to unsurveyed and unlocated claims. Brazeau's grant was unauthorized, for the lieutenant governor of Louisiana had no power to grant lands. There was no definite location of Brazeau's grant. There was no Spanish, French or American survey of it at the time of the confirmation; not even a figurative plat of it filed of record. The confirmation carried with it the condition of survey. (West v. Cochran, 17 How. 403; Staniford v. Taylor, 18 How. 512). Plaintiff, as representative of Brazeau, has no title to any land outside of the United States survey under the confirmation. The claim to an equity to claim a location within the Soulard survey confirmed and retraced by the United States and patented to Labeaume's representatives is expressly repudiated by the majority of the court in the case of West v. Cochran, and Staniford v. Taylor, 18 How. 512.

II. It is not true that the confirmations to Labeaume and Brazeau are to two persons for the same land. The confirmation to Brazeau must be located according to the reservation in the deed of May 9, 1798, if it can be located at all by evidence *dehors* the United States survey. The evidence clearly shows that the Brazeau reservation was south of Labeaume's south ditch. How can a court of equity decree, after sixty years' possession, by a common boundary line, that the Brazeau reservation is to be located at a different place from that described in the deeds under which the respective proprietors on the north and south claim title? If there could be any doubt in regard to this question, will the court, after this lapse of time, disturb innocent purchasers

for a valuable consideration, when the property has increased in value from forty dollars to five hundred thousand dollars. Plaintiff's equitable claim arose, if at all, fifty years ago. Soulard's survey did not include the reservation, and the court has so found. There is no doubt of the correctness of the finding. The plaintiff sold to L. V. Bogy the whole of the Brazeau reservation south of the Soulard survey for Labeaume, and if he can persuade this court to relocate the same reservation within the Soulard survey, the representatives of Brazeau will obtain thirty-two arpens of land under a confirmation for four arpens made by the board, in direct violation of law, to a man who was not a claimant and had no interest. The survey by the United States located the land, and there is not even a plausible excuse for claiming a relocation. (West v. Cochran, 17 How. 403.) See report of argument for respondent when the case was on appeal before.

NAPTON, Judge, delivered the opinion of the court.

This case presents substantially the same questions that were before the court when it was here before. (25 Mo. 484.) Upon the last trial, in the land court, all the evidence was submitted, and there was a finding by the court of the facts; but upon this finding the same questions arise as did upon the demurrer to the bill.

It is unnecessary to repeat what I said when the case was here before. Upon the propriety of the location of the Brazeau reservation by survey under the Secretary of the Interior in 1852, I give no opinion. I consider the case as decided by the case of Cochran v. West; and if it should turn out that I am mistaken in the construction given to this and other decisions of the supreme court of the United States, I prefer leaving to that court an examination into the question of location which will arise in the event that these decisions have been misunderstood.

It has been suggested that the survey of Brown of two tracts in one may be treated as the authoritative government survey; and if so, that there is nothing in the principle deter-

mined in Cochran v. West to prevent a correction of the last survey which located the Brazeau reservation outside of the Labeaume concession and south of the ditch. But it will be observed that all these surveys—Soulard's, Brown's, and the survey under the directions of Secretary Stuart—were all before the court in the case referred to, and the last was regarded by the court as the authoritative survey.

Upon this ground alone of *res adjudicata*, I am for affirming the judgment of the land court.

Judge Ewing concurs in this opinion.

Scott, Judge. P. Chouteau owned two parcels of land north of St. Louis. One of these tracts was supposed to be immediately north of and adjoining the other. On the first of June, 1826, Chouteau conveyed to G. F. Strother these tracts of land by the following descriptions: "All that tract or parcel of land granted to the said Pierre Chouteau in October, 1797, by Charles Dehault Delassus, Spanish commandant, beginning at Roy's line, running north to Labeaume's south line, and extending from the river to the common fields west, it being intended hereby to convey to the said G. F. Strother, his heirs and assigns, all the land contained within the said concession, except that heretofore sold by the said Pierre Chouteau according to his said several contracts, to be limited by the metes and bounds limited and fixed by the intention of the parties at the period of contracting. And one other tract of land containing four arpens, running on the river, and running back four arpens, making sixteen arpens, lying between the north line of the first described tract of land and the south boundary of the tract of land sold by Joseph Brazeau to Labeaume; said sixteen arpens being a tract or parcel of land confirmed to Joseph Brazeau, and sold and conveyed by Joseph Brazeau to Pierre Chouteau." The exceptions in the granting part of the deed in relation to the first tract described have no influence in this controversy, as they all lie south of the land in dispute.

On the 3d of September, 1830, Strother, by a deed containing an exception not affecting this controversy, conveyed the tracts of land he purchased from Chouteau to John O'Fallon and John Mullanphy, in trust for the St. Louis Marine Railway Company. With the exception above stated, this deed professed to convey to the said trustees the same tracts, pieces or parcels of land which the said G. F. Strother purchased from Pierre Chouteau by the deed above mentioned, and the description of the tracts in the two deeds correspond in substance if not in words.

On the 31st of January, 1851, the St. Louis Marine Railway Company passed the following resolutions : " 1st. That the land belonging to or claimed by the St. Louis Marine Railway Company in the city of St. Louis, and north of what is known as Labeaume's ditch, being four arpens in front on the river, and four arpens in depth, and bounded on the east by the Mississippi river, and south by said ditch of Labeaume, and containing sixteen arpens, be conveyed to John Magwire, and that J. O'Fallon, surviving trustee, who holds the legal title to the said land, be and he is hereby directed to make said conveyance to said Magwire and deliver the same. 2d. That, on receiving the deed on the last resolution mentioned, said John Magwire execute and deliver to the stockholders of said company an agreement to commence suits or other proceedings, without delay and at his own expense, for the recovery of the land to be conveyed to him, and on recovering the same, or any part thereof, to convey to each stockholder such portion of said land as shall be equal to one-fourth of what is represented by the stock such stockholders may hold at the time of said recovery." Magwire entered into an agreement in pursuance to this resolution, and on the 2d of January, 1852, John O'Fallon executed to him a deed in which the land is described as set forth in the foregoing resolutions. Thus it appears that the St. Louis Marine Railway Company has employed the plaintiff to prosecute this suit for the company, and the plaintiff can not be viewed in a more favorable light than the company itself.

Now the concession to Chouteau, as surveyed by the United States, which is the first tract mentioned in the deed from him to Strother, did not extend so far north as it was made to extend by the Spanish survey made for Chouteau under his concession. The Spanish surveyor bounds this concession on the north by the land of Labeaume, and on the figurative plat accompanying the survey there is marked a ditch as the northern boundary of the survey.

Brazeau originally, under the Spanish government, owned the land which is described above as Labeaume's. He sold it to Labeaume, and after Labeaume purchased from Brazeau he obtained from the Spanish government an extension of the limits of the land he so purchased. Brazeau, in making a sale to Labeaume, reserved to himself four arpens of land to be taken at the foot of the hillock in the southern part of said tract. This hillock is some distance below the ditch marked as the northern boundary of the Spanish survey of Chouteau's concession by Delassus. The space between a line from the foot of the hillock and the ditch would contain some eighteen and a half arpens. This hillock, in the earliest Spanish documents concerning Brazeau and Labeaume's concessions, transfers and reservations, is called the *grange de terre*. It is a noted object, the locality of which admitted of no uncertainty or dispute. In July, 1816, Brazeau conveyed to Pierre Chouteau the reservation of four by four arpens in pursuance, as it is alleged in the deed, to a previous sale. This deed describes the tract of four by four as situated in the south part of the concession to Brazeau which he conveyed to Labeaume. These facts are narrated not with a view to locate the four by four tract reserved by Brazeau and by him sold to P. Chouteau, who conveyed to Strother and who conveyed to the trustees of the St. Louis Marine Railway Company. They are stated to show that there was a ground for dispute as to the fact whether the four by four tract should be located north or south of the ditch.

The government of the United States surveyed and located the four by four tract immediately south of the ditch of

Labeaume, and on the 25th of March, 1852, issued a patent therefor to Joseph Brazeau or his legal representatives. The plaintiff John Magwire, claiming to be the representative of Brazeau, refused to receive this patent because it did not properly locate the four by four tract, placing it south instead of north of Labeaume's ditch, and during the pendency of this suit the patent was recalled.

In 1856 the patent for the four by four was demanded of the recorder of land titles by Louis G. Picot, trustee of Ann Biddle, who was an original stockholder in the Marine Railway Company, and to whom the said company had conveyed two lots in the year 1841, which lots are situated within the boundaries of the patent to Joseph Brazeau. This demand was made by Picot as a representative of Joseph Brazeau.

Under these circumstances, how does the Marine Railway Company or its agent Magwire claim to be the exclusive representative of Brazeau? Is not Picot a representative of Brazeau, having a prior right to Magwire? Can Magwire, as agent, claiming as agent of the Marine Railway Company, have rights superior to those who claim by a prior title from that company? Can Magwire insist that, as representative of Brazeau, he is entitled to the land north of the ditch, and thus exclude those who are prior in right to him, claiming to be the same representative? Magwire only claims the land north of the ditch. Now if Picot, as representative of Brazeau, is entitled to the land by a prior title from the Marine Railway Company, whether it is north or south of the ditch, can there be any equity in the subsequent claim of Magwire? If the government of the United States had a right to locate the four by four; if that location has been made and a patent issued to Joseph Brazeau or his legal representatives; if Picot, claiming to be the representative of Brazeau, is willing to take the land as located by the United States, on what ground shall Magwire, the agent of the Marine Railway Company, prevent this after the company has made Picot such representative. The company can not have land both north and south of the ditch. If it has placed

Picot south, and the government has given him a patent where the company has located him, what right has that company, through its agent, the plaintiff, to deny him the benefit of that patent, and, by seeking for a location of the land elsewhere, violate its faith and obligations to him.

These doubts and difficulties suggest themselves to my mind in considering this case. I can not see how the company, or its agent Magwire, can have any equity in this case whilst there is a prior appropriation of the four by four south of the ditch to its alienee. Picot is not before the court. His claim under the patent has not yet been presented to us. Whether he has any claim under the patent; whether the officers of the government could appropriate the land to the satisfaction of the four by four claim; what has been the effect of recalling the patent; whether that act does divest any right previously vested in him; whether Magwire by refusing the patent could affect his rights, are all questions not presented by the record, and nothing will be said in relation to them, but it seems to me will have to be determined before we can ascertain whether there is any equity in Magwire suing for the Marine Railway Company.

If the title to the four by four located north of the ditch was in the Marine Railway Company, and if it had previously sold and appropriated that tract south of the ditch, and had afterwards defeated the right of her alienee, I do not see why she would not be compelled to hold such title in trust for those who were wronged.

I must know what the company has done with the land south of the ditch before I can say that there is any equity in Magwire. This is not the former action of ejectment in which the mere legal title is involved, but it is a bill in chancery, and the equity of the party must appear.

I do not see that the claim of the plaintiff is strengthened by his deed from Hamilton, the administrator of Strother. It appears to me that that deed was ineffectual, as Strother in his lifetime had conveyed away all his interest in the four by four tract.

When this case was here before, I expressed the opinion, founded on a fact which I supposed I was warranted in assuming by the consent of the plaintiff's counsel, that there was no equity in the bill. Was I in error in supposing that I was warranted in making that assumption? Yet the case, as now presented, furnishes ground, as I conceive, for the same opinion. As the case has been tried again since then, and as the same difficulty existed in the way of recovery on the part of the plaintiff and he did not see proper to obviate it, but insisted on his equity as his bill was framed, I am in favor of an affirmance of the judgment, believing that, under the circumstances, it would be unwarrantable to keep the defendants longer before the court.

The judgment must be affirmed, in my opinion. The other judges concur in affirming the judgment.