JACOB KISSELL, PLAINTIFF IN ERROR, *v.* THE BOARD OF THE PRESIDENT AND DIRECTORS OF THE ST. LOUIS PUBLIC SCHOOLS.

The act of congress passed on the 13th of June, 1812, (2 Stats. at Large, 748,) reserved for the support of schools in the respective towns or villages in Missouri " all town or village lots, out-lots or common-field lots, included in such surveys," (which the principal deputy-surveyor was directed in a preceding section to make,) "which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, provided that the whole quantity of land contained in the lots reserved shall not exceed one twentieth part of the whole lands included in the general survey of such town or village."

The act of 26th of May, 1824, (4 Stats. at Large, 65,) directed the individual claimants to present their claims within a specified time, after which the surveyor-general was to designate and set apart the lots for the support of schools.

The act of 27th of January, 1831, (4 Stats. at Large, 435,) relinquished the title of the United States in the above lots to the inhabitants of the towns, and also in the lots reserved for the support of schools, to be disposed of or regulated as the legislature of the State might direct.

In 1833, the legislature incorporated a board of commissioners of the St. Louis public schools, and, in 1843, the surveyor returned a plat in conformity with the above laws.

The title to the lots thus indicated by the surveyor as school lots enured to the benefit of the school commissioners. Until the survey, the title was like other imperfect titles in Louisiana, waiting for the public authority to designate the particular land to which the title should attach.

The certificate of the surveyor is record evidence of title, and the question is not open whether or not these lots were out-lots or common-field lots, or other lots described in the statute. The title is good until some person can show a better.

Such a better title was not found in an entry under the preëmption laws of April 12, 1814, and 29th of April, 1816. The land in question was within the limits of the town of St. Louis, and was also reserved from sale. For both reasons it was not subject to preëmption.

The ignorance of the preëmptioner that the land was reserved, does not prevent the entry from being void.

THIS case was brought up from the supreme court of Missouri by a writ of error issued under the 25th section of the judiciary act.

It was an ejectment, brought by the board of school commis-sioners, to recover from Kissell the following lot in St. Louis county, namely: Beginning on the west side of a street running parallel with and next east of Carondelet Avenue, called Law-rence street or Short street, at a point 120 feet south of the intersection of said street with Wood street; thence westwardly in a line parallel with Wood street 120 feet to an alley; thence southwardly along the said alley 90 feet; thence easterly in a line parallel with Wood street 120 feet, and thence to the place of beginning.

The suit was brought in the St. Louis circuit court, (state court,) where there was a judgment for the plaintiffs. Kissell carried it to the supreme court, where the judgment was affirmed, and a writ of error brought the case up to this court.

The school commissioners claimed title under the three acts of congress mentioned in the head-note of the case, and the sur-vey made in 1843, a copy of which was produced in court. Kissell claimed under an entry of fractional section 26, made by Robert Duncan, on the 2d of May, 1836, by virtue of a pre-emption right.

Without a copy of the map, it is difficult to convey to those members of the profession who are not familiar with Missouri land cases, a clear idea of the nature of this case. It may be proper, however, to mention that it contained numerous long and narrow parallelograms, which, it was contended, were the only lots referred to by the statutes as out-lots, &c., whilst the pieces of land designated by the surveyor as school lands were in detached pieces, scattered about in various places.

It was argued by *Mr. Lawrence* and *Mr. Johnson*, for the plaintiff in error, for whom there was also a printed argument filed by Mr. Thomas C. Johnson, of St. Louis. For the defend-ants in error, it was argued by *Mr. Geyer*.

The points made on behalf the plaintiff in error, were: 1. That, by the terms of the act of 1812, lots reserved for school purposes were such only as had a previous existence under the Spanish government. 2. That it was to the limits of the Span-ish, and not to the limits of the American town, that reference is made in the proviso to the second section, limiting the lots re-served for the support of schools to one twentieth of the land within such town or village; and, 3. That by the term "out boun-dary," used in the first section, reference is not made to a con-tinuous out boundary or "ring survey," but to the out boundary respectively of the town, common-fields, and commons, sepa-rately.

The points made by *Mr. Geyer* were the following, namely:

1. The act of congress of the 13th of June, 1812, making further provision for settling the claims to land in the Territory of Missouri, and the acts supplementary thereto, of the 26th of May, 1824, and 27th of January, 1831, together with the certificate of the surveyor-general of the survey, designation and setting apart of the land in controversy, for the support of schools, constitute a complete legal title, equivalent to a patent, conclusive upon the United States, to which the mere entry of the same land with the register and receiver must yield.

2. The survey of the out-boundaries of the town of St. Louis, given in evidence, having been made and certified by the surveyor general, in pursuance of authority vested in him by law, neither its accuracy nor its validity was open to question in the case at bar.

3. The certificate of the surveyor-general, of the survey, designating and setting apart the land in question, is evidence not only that it is within the out-boundaries, but that it was, at the time of designation, a vacant lot, reserved by the act of 1812, had not been selected for military purposes by the President, and does not, together with the lands before assigned, exceed the maximum limit; and, unless it appeared that the United States had no title, or the surveyor-general no authority to make the survey and designation, it is conclusive, upon a principle applicable alike to all official acts of public officers in the disposition of public lands.

4. The " Plat and description of the survey of the out-boundaries of the town (now city) of St. Louis," made and certified by the surveyor-general, if not absolutely conclusive, is at least *primâ facie* evidence that it is in conformity with the requirements of the act of 1812, and, for the purpose of this case, *that* is all-sufficient. No evidence is necessary to support the survey, and there is none on the record competent to overthrow it.

5. If the survey and designation of the lot in question to the use of schools shall be held to be subject to review in a collateral action at law, still, it requires the production of no evidence in aid of it. It stands for proof until it is rebutted; and, in this case, there is no testimony produced by the defendant below, competent to repel or impair its force.

Mr. Justice CATRON delivered the opinion of the court.

In this case, the school commissioners were plaintiffs in their corporate capacity, and, in order to eject the defendant below, were bound to produce a legal title to the land claimed. Their title depends on three acts of congress, passed in 1812, 1824,

and 1831. The act of 1812 confirmed, to private owners at St. Louis and other villages in Missouri, town lots, out-lots, and common-field lots, in, adjoining, and belonging to the towns, and it also confirmed to the towns their commons.

This act made it the duty of the principal surveyor to survey, or cause to be surveyed and marked, (where the same had not already been done according to law,) the out-boundary lines of the said several towns and villages, so as to include the *out-lots*, common-field lots, and commons thereto respectively belonging.

The second section provides, " that all town or village lots, out-lots, or common-field lots, included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be, and the same are thereby, reserved for the support of schools in the respective towns and villages ; *Provided,* the whole quantity of land contained in the lots reserved for the support of schools shall not exceed one twentieth of the whole lands included in the general survey of any town or village."

The first section of the act of the 26th of May, 1824, requires the owners of lots which are confirmed by the act of the 13th of June, 1812, within eighteen months after the passage of the act, " to designate their said lots by proving, before the recorder of land titles, the fact of inhabitation, cultivation, or possession of their said lots, and the boundaries and extent of each claim, so, as to enable the surveyor-general to distinguish the private from the vacant lots appertaining to said towns and villages."

The second section of this act makes it the duty of the surveyor general, immediately after the expiration of the time allowed for private owners to prove the inhabitation, cultivation, and possession of their lots, " to proceed, under the instruction of the commissioner of the general land-office, to survey, designate, and set apart to the said towns and villages, respectively, so many of the said vacant town or village lots, out-lots, and common-field lots, for the support of schools in said towns and villages, respectively, as the President shall not, before that time, have reserved for military purposes, and not exceeding one twentieth part of the whole lands included in the general survey of such town or village, according to the provision of the second section of the act of the 13th of June, 1812 ; and also to survey and designate, as soon after the passage of this act as may be, the commons belonging to the said towns and villages, according to their respective claims and confirmations under said act of congress, where the same has not already been done."

By the third section of the act, the recorder of land titles is required to issue a certificate of confirmation for each (private) claim confirmed, "and, as soon as the said term (eighteen months) shall have expired, furnish the surveyor-general with the list of lots proved to have been inhabited, cultivated, or possessed, to serve as his guide in distinguishing them from the vacant lots to be set apart as above described, (for the use of schools,) and shall transmit a copy of such list to the commissioner of the general land-office."

On the 27th of January, 1831, an act of congress was passed, for the purpose of transferring the title of the United States (if any) remaining in the property belonging to the several towns and villages embraced by the act of the 13th of June, 1812.

The first section relinquishes to the inhabitants of the several towns and villages all the right, title, and interest of the United States in and to the town and village lots, out-lots, and common-field lots confirmed to them by the first section of the act of the 13th of June, 1812. The second section relinquishes all right, title, and interest of the United States in and to the town and village lots, out-lots, and common-field lots reserved for the support of schools, by the act of 1812, in the respective towns and villages, and provides that "the same shall be sold or disposed of, or regulated, for the said purpose, in such manner as may be directed by the legislature of the State of Missouri."

The defendants in error were incorporated by a public act of the legislature of Missouri, approved the 13th of February, 1833, entitled "An act to establish a corporation in the city of St. Louis, for the purpose of public education." By the ninth section of this act, the title, possession, charge, and control of all lands and lots in or near St. Louis, granted to the inhabitants for school purposes by any act of congress, is vested in the board of school commissioners, with power to dispose of and apply the same to the purpose of education.

At the trial, the (then) plaintiff gave in evidence the following documents, among others :—

1. A plat called and known as map X, being certified by the surveyor-general to be "a plat and description of the survey of the out-boundary lines of the town (now city) of St. Louis, in the Territory (now State) of Missouri, as it stood incorporated on the 13th of June, 1812, including the out-lots, common-field lots, and commons thereto belonging, made in pursuance of the first section of the act of congress approved the 13th of June, 1812, entitled 'An act making further provision for settling the claims to land in the Territory of Missouri,' which was approved and certified by the surveyor-general, December 8, 1840."

2. A certificate of the surveyor-general, in pursuance of instructions of the commissioner of the general land-office, as follows:—

### "Assignment and Survey, No. 367."

#### "Office of the surveyor of public lands in the States of Illinois and Missouri, St. Louis, June 15, 1843."

"Under the instructions of the commissioner of the general land-office, the piece of land, the survey of which is herein platted and described, has been legally surveyed, and under the instructions aforesaid it is hereby designated and set apart to the town (now city) of St. Louis, for the support of schools therein, in conformity with the second section of the act of congress, approved the 26th of May, 1824, entitled an act supplementary to an act passed on the 13th day of June, one thousand eight hundred and twelve, entitled "An act making further provisions for settling the claims to land in the Territory of Missouri;" the said piece of land hereby designated and set apart as aforesaid is situated within the bounds of the survey directed to be made by the first section of the act of the 13th of June, 1812, aforesaid, so as to include the town-lots, out-lots, common-field lots and commons of the town of St. Louis; and is also within the limits of the said town of St. Louis, as it stood incorporated on the 13th day of June, 1812; and does not, together with all other land designated and set apart to the town of St. Louis for the support of schools, under the aforesaid second section of the act of congress of the 26th of May, 1824, amount to one twentieth of the whole lands included in the general survey directed to be made of said town of St. Louis, by the aforesaid first section of the act of congress of the 13th day of June, 1812; the said piece of land was not, so far as the records of the office show, rightfully owned or claimed by any private individual on the said 13th day of June, 1812; nor was it held as common belonging to the said town of Saint Louis; neither has it been reserved by the President of the United States for military purposes."

Similar certificates are found in the record for other parcels of lands assigned to the use of schools, but not involved in controversy.

When Louisiana was acquired, the lands included in the outboundary survey, comprising St. Louis, its fields and commons, were held by imperfect rights, the legal title being vested in the United States, as they had previously been in the government of Spain. As this government could not be sued in its own courts, nor coerced to perfect equitable claims and rights, claim-

ants had to rely on its justice ; and as congress had the full and sole power by the constitution to dispose of the public lands, and to make needful rules and regulations for that purpose, it followed that those who sought titles must obtain them on the terms that congress might prescribe ; and more especially were the donations made by the act of 1812, to promote education, regulated by this rule.

By the act of 1812, the towns acquired the promise of, and an imperfect title to, certain vacant lands that might be found to exist within an out-boundary survey, but the government reserved to itself the power to make this survey, and the board of school directors was therefore compelled to remain passive until it was completed, and the private claims within it ascertained, and until the United States designated the school lands comprehended within it.

This survey was completed in 1840 by the surveyor-general, and in 1843 he fulfilled the duty of designating the school lands, whereby they became vested in the authorities of Missouri. These proceedings exhausted the powers of the surveyor-general under the acts we have quoted ; and whatever controversies may now arise, in reference to these lands, must be subject to judicial cognizance. See Elliott v. Piersol, 1 Pet. 341.

Our opinion is, that the school lands were in the condition of Spanish claims after confirmation by the United States, without having established and conclusive boundaries made by public authority, and which claims depended for their specific identity on surveys to be executed by the government. The case of West v. Cochran, 17 How. 413, lays down the dividing line between the executive and judicial powers in such cases, to wit : That until a designation, accompanied by a survey or description, was made by the surveyor-general, the title attached to no land, nor had a court of justice jurisdiction to ascertain its boundaries.

We are furthermore of opinion that the certificate of the surveyor-general, above set forth, and which was accepted by the grantees, is record evidence of title, by the recitals in which the government and the board of school directors are mutually bound and concluded. And this instrument, declaring that the land prescribed was reserved for the support of schools, and the courts of justice having no power to revise the acts of the surveyor-general under these statutes, as respects the school lands, it is not open to them to inquire whether the lands set apart were or were not lots of the description referred to in the statutes. The parties interested have agreed that this land was a school lot, and here the matter must rest, unless some third person can show a better title. And the plaintiff in error insists

that he has shown a better one by the production of Duncan's entry covering the land. It was allowed by the register and receiver at St. Louis, May 2, 1836, for the fractional section No. 26, by virtue of a preëmption claim set up by Duncan.

Of this land, the designated school lot claimed by the plaintiff below includes five acres and $\frac{66}{100}$ths of an acre.

The entry was contested, and was brought to the consideration of the commissioner of the general land-office, and upon August 1, 1845, he instructed the register and receiver that only $8\frac{20}{100}$ acres was vacant at that spot; the residue of the $35\frac{49}{100}$ acres surveyed as fractional section 26, had been located on private claims; nor was there evidence that any part of the $8\frac{66}{100}$ acres had been inhabited as required by the preëmption laws. This inquiry, he remarks, was however unnecessary, because the $8\frac{66}{100}$ acres had been reserved for the support of schools in the town of St. Louis by the act of 1812, and, a selection of said land, for that purpose, having been made under the act, "it cannot, therefore, be subject to the operation of the subsequent preëmption laws of 1814 and 1816."

He further declared: "In addition to the above objection, the said land is within the corporate limits of the city of St. Louis, as established in 1809, and, if not so reserved, would not have been subject to preëmption subsequent to that time—the principle having been early settled in a preëmption case for land within the limits of the town of Mobile, that the right of preëmption, designated for the benefit of agriculturists, could not be regarded as applicable to residents within the bounds of an incorporated city or town." For the foregoing reasons, the entry of fractional section 26, for $35\frac{49}{100}$ acres, was cancelled, and the register and receiver were ordered to refund the purchase-money.

On these facts, the circuit court gave to the jury the following charge:—

"The court is asked to instruct you, that the claims of the respective parties to the land in controversy must depend mainly upon the question, whether the land was reserved for the use of schools by the act of the 13th of June, 1812. In this view the court concurs; but without advising you more at large upon that subject, as requested, gives the case the direction indicated by two of the propositions submitted, one on either side, designed to effect a comparison between the titles of the parties. These are as follows:—

"On the part of the defendant, 'that the preëmption to Robert Duncan conferred a valid claim under the preëmption laws, and that he, having settled upon the land before any survey thereof was actually made, is entitled to hold it, and that the persons

deriving title from said Duncan have a title superior to the plaintiffs.'

" On the other hand, it is insisted ' that the title of the plaintiffs, under the act of the surveyor-general, designating and setting apart the ground in controversy to the plaintiffs, is superior to the title of the defendant, under an entry with the register and receiver of the land-office ; ' and of this opinion is the court. The jury is therefore instructed, that, upon the titles exhibited in testimony by the parties, the plaintiff is entitled to recover.

" The court adds, that the defendant has the right to impeach the title of the plaintiff, the same and to the same extent as if the entry of Duncan, under which he claims, had not been vacated by the commissioner of the general land-office. And the court further instructs the jury, that no evidence has been adduced on the part of the defendant competent to invalidate or overthrow the plaintiff's title, and therefore the jury should find for the plaintiff."

The conflicting titles both depend on acts of congress, and are submitted to this court on the whole record ; and which we are called on to compare, as was done in the cases of Matthews *v.* Zane, 4 Cranch, 382; Ross *v.* Barland, 1 Pet. 664; and Jackson *v.* Wilcox, 13 Pet. 509. This follows from the instruction given, which maintains that the title of the board of public schools, under the certificate of the surveyor-general, setting apart the land in dispute to the plaintiffs below, was superior to the defendants' title under Duncan's entry with the register and receiver; and that, therefore, the jury was directed to find for the plaintiff. This general instruction raises the question, whether the land was subject to sale, to one claiming a preference of entry under the preëmption laws.

To which it may be answered, that when the act of 1812 dedicated certain lands for the purposes of education to the use of the village of St. Louis, and the act of 1831 vested the title to these lands in the city, such lands were appropriated, and not subject to sale; they were beyond the reach of the officers of the government, nor could their action lawfully extend to them, with the exception that they could be ascertained and designated within the power reserved. Nor could Duncan be heard to say that he did not know that this parcel of land was reserved. The same excuse might be made, and with a much greater claim to justice and propriety, by one who obtained an entry on land reserved from sale for military purposes, or for some other public use, by the President; the fact of which reservation was hardly known beyond the general and local land-offices; yet such entries have constantly been set aside as absolutely void, or as

voidable, by the department of public lands. The case of Wilcox *v.* Jackson, 13 Pet., was an instance of the first kind, where the entry was pronounced as absolutely void, it being in the notorious limits of a reservation for military purposes; and so here the entry of Duncan was within the notorious limits of the city of St. Louis, according to the record of incorporation made by the court of common pleas for St. Louis county, in 1809, and which city limits are recognized by the department of public lands and by the out-boundary survey, as the existing limits when the act of 1812 was passed. This appears from the documents offered in evidence, on which the instruction to the jury was founded. We, therefore, concur with the views expressed by the state courts and those of the commissioner of the general land-office, that Duncan's entry was invalid.

As this concurrence with the state courts is conclusive of the controversy, we do not deem it necessary to examine further into the titles and instructions given to the jury.

It is proper to remark, that we are here dealing with the survey, (marked X,) and ascertaining its effect as regards the lands granted and allotted for school purposes, and are not to be understood as having expressed any opinion on the effect of this out-boundary survey on titles situated beyond it, and claimed to have been confirmed by the act of 1812, or which were subject to be identified by the recorder of land titles, under the act of 1824.

For the reasons above stated, it is ordered that the judgment of the supreme court of Missouri be affirmed.