# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT

## JANUARY TERM, 1878.

[No. 4790.]

C. C. OAKLEY *v.* JAMES F. STUART, PHILIP COSGROVE, JAMES BYRNE, AND JAMES R. LINEBAUGH, DEFENDANTS—ISAAC MILLER, INTERVENOR.

CONSTRUCTION OF LAND LAWS.—Courts should not depart from a construction of legislative acts relating to the public lands of the State, by those immediately charged with their administration, if it accords with the natural meaning of the acts construed, unless it has proved to be productive of confusion or promotive of litigation, or otherwise in conflict with the policy of the law.

CASES DISTINGUISHED.—The present case is clearly distinguishable from that of *Rooker* v. *Johnson*, 49 Cal. 3, in which none of the applications were made intermediate the survey in the field and the filing of the official plat in the United States Land Office.

SURVEY IN THE FIELD—WHAT IS ?—As determined by the practice of the Land Departments of the United States and of the State, lands are surveyed when the lines are run in the field and monuments or marks established by the proper surveyor.

STATE LANDS — MODE OF SALE PRESCRIBED BY THE LEGISLATURE. — The State may dispose of the land it owns in the present or in expectancy, and a resident may apply to purchase the same in such manner as the Legislature may deem proper—the applicant's right to the *land* being contingent on its acceptance as a part of a grant to the State.

STATE LANDS—APPLICATION TO PURCHASE — CERTIFICATE.—At any time after an authorized survey in the field of land included in a Federal grant to the State, an application in due form by a person competent to make it, to purchase such land, may be made and filed in the State Land Office; but the

[ 521 ]

issuance of a certificate of purchase to the applicant will be subject to the acceptance of the land applied for by the Register of the United States Land Office as a part of such grant.

RIGHTS OF APPLICANTS—WHEN IN ABEYANCE—How DETERMINED.—Application to purchase land of the State and acceptance of the location by the Register of the United States Land Office are not contemporaneous acts; and the rights of applicants will remain in abeyance until the recognition of title in the State, when the right to a certificate will attach in favor of the applicant first in time after the survey.

ADVERSE APPLICATIONS.—The question being which of several applicants is entitled to a certificate, the answer is, he who filed first after the actual survey in the field, approved by the Surveyor-General.

APPEAL from the District Court of the First Judicial District, County of Santa Barbara. The Intervenor, Isaac Miller, appeals.

The action was brought to decide a contest between adverse applicants in the Surveyor-General's Office to purchase the same tract of school land included in a sixteenth section. Oakley sues to have his application for the land approved, and to have the certificates of purchase to Stuart and Linebaugh declared null and void. Miller intervenes, setting up his transfers from Stuart and Linebaugh, and praying that Oakley's application be declared null, and that patent be issued to him. The land was surveyed in the field—the township lines having been run in 1854, and the section lines January 16th, 1861. This survey was approved by the United States Surveyor-General on the 9th of April, 1861, and an approved map of said survey was filed in the office of the Surveyor-General of the State in the same month. The plat of said survey was not filed in the United States Land Office, however, until April 11th, 1873.

The defendant Linebaugh, in January, 1871, filed an application in due form, in the office of the State Surveyor-General, for the purchase of the land in dispute, to wit: East one-half section sixteen, township ten north, range thirty-four west, San Bernardino meridian, which application was approved April 16th, 1874, and a certificate of purchase issued thereon to him, Linebaugh. When this application was made there was no adverse occupation of any part of the land. Linebaugh assigned his certificate of purchase to the intervenor and appellant Miller, on May 2nd, 1874.

On April 12th, 1873, defendant Stuart also made an application for the purchase of these lands, which was approved, and upon which a certificate of purchase was issued to him, Stuart, on August 21st, 1873. This certificate of purchase was assigned by Stuart to said intervenor and appellant Miller, September 27th, 1873. The Court found that there was an adverse occupancy of the land at the date of Stuart's application, which fact was not stated in said application.

The plaintiff, Oakley, made an application for the land on May 6th, 1874, and upon his demand the matter was referred to the District Court to determine which of the several applications was good. Stuart and Linebaugh were made defendants; and Miller the appellant, as the assignee of both Stuart and Linebaugh, intervened, praying the judgment of the Court as to which of the two applications and certificates he held under.

The chronological order of surveys and applications is as follows:

1854, June—Township lines run.

1861, January 16—Section lines run.

1861, April 9—Survey and map approved by J. W. Mandeville, United States Surveyor-General. Certified copy thereof transmitted in same month to office of State Surveyor-General, and duly filed therein.

1869, Jan. 9—Application of Cosgrove & Byrne for all of sec. 16 filed in office of State Surveyor-General. (Subsequently abandoned.)

1871, Jan. 6—Application of James B. Linebaugh for the land in dispute filed in same office.

1873, April 11—Official plat filed in United State Land Office, District of San Francisco.

1873, April 12—Application of James F. Stuart for the land in dispute filed in office of State Surveyor-General.

1874, Feb. 24—Application of C. C. Oakley for same land filed in same office.

1874, May 6—Oakley's second application filed in same office.

1875, Feb. 1—Abandonment of Cosgrove & Byrne filed in same office.

*J. F. Stuart*, in pro. per., *R. M. Dillard*, *E. Fawcett*, *H. H. Haight*, and *Edward R. Taylor*, Attorneys—and *Gray & Haven*, of Counsel for Appellant.

The main questions at issue in this case are:

1st. When are lands of the United States surveyed and. treated as surveyed by the United States?

2nd. Under the laws of the State of California, when are· proper applications to purchase lands of the sixteenth and thirty-sixth sections of the State, legally filed in the office of the State Surveyor-General?

As to the first question, subdivision of sec. 2398 of the Re- vised Statutes prescribes five requisites of a valid survey, as. follows:

1st. A survey in the field by the proper officer.

2nd. An approval of the survey by the Surveyor-General.

3rd. The platting of the survey by the Surveyor-General.

4th. The making a *record* of the plat in the office of the Sur- veyor-General.

5th. The filing in the Local and General Land Offices of the; record so made.

When, then, is the survey complete, so as to be brought· within the State statute? If the question were as between the survey in .the field, and the approval of the survey, or the record of the survey, there might be some doubt; but as be- tween the record in the Surveyor-General's Office, and the filing a transcript of that record in the Local Land Office, how can there be any doubt whatever? How is it possible to say that there has been no survey, simply because a transcript of the record of survey has not been sent to the Local Land Office?· As well could it be held that the survey is an incomplete thing· until the transcript has been sent, as it has to be, to the General Land Office. All the doings of the Surveyor-General's Office are subject to approval or disapproval by the General Land Office, and˙with the same reason it could be contended that until a copy of the plat had reached that office, no resident of the State would be authorized to make an application to pur- chase a sixteenth or thirty-sixth section.

Note that the *record* and the *originals*, both of the field-notes and of the plat, are to be kept in the office of the Surveyor-General; it is but *copies* which are to be sent to the Local and General Land Offices. The official seal of approval is put upon the survey in the office of the Surveyor-General; and, certainly, when that is done, if not before, the land can be said to have been surveyed by authority of the United States.

Attorney-General Cushing, in the matter of Iowa Railroad claims, (8 Opinions of Attorneys-General, 390) held that by surveying and marking on the ground the lines of proposed railroads, these lines were definitely fixed; it having been contended on the other side that no such result followed until the plats of survey were returned to the Local and General Land Offices. And he says (p. 393):

" Is it necessary, in order to consummate the expropriations and the new appropriations, that a plat should be drawn up and filed in some public office? I think not, *unless that be expressly required by the statute*, as the condition of the change of property. *If not so expressly required as condition of title, such filing of a plat anywhere is but a matter of* NOTICE. But if the points have been actually marked on the earth, then the plat is but written authentication or evidence of that fact, and the filing of the plat, information, or notice of what had been previously done."

The question as to when lands of the United States are surveyed necessarily came up for decision in the General Land Office immediately after the passage of the General Pre-emption Law of Congress of September the 4th, 1841. That law allowed settlements to be made *only on surveyed lands*, and provided " that when two or more persons shall have settled on the same quarter-section of land, the right of pre-emption shall be in him or her who made the first settlement." (See 1 Lester, pp. 61 and 62, secs. 10 and 11.)

On the 15th of September, 1841, the Commissioner of the General Land Office issued his circular letter in reference to said law, and decided the question as to when the lands were surveyed, as follows:

" The approval of the plat is the evidence of the legality of

the survey; but in accordance with the spirit and intent of the law, and for the purpose of bringing the settlers within its provisions, the land is to be construed as surveyed *when the requisite lines are run on the field and the corners established by the Deputy Surveyor.*"

The Act of Congress of September 4th, 1841, and the Act of August 4th, 1854, and the Act of February 26th, 1859, the Act of May 30th, 1862, and of March 3rd, 1873, are all based upon the idea that as soon as a valid legal survey has been made in the field of lands of the United States, they are to all intents and purposes, and are to be treated as, surveyed lands. Upon this point it will be seen that the Act of Congress of February 26th, 1859, adopts this theory, and makes all settlements after the survey in the field illegal, as the lands are then State lands. " We consider that in the grant to California of March 3rd, 1853, the power of locating the quantity granted * * * was reserved to the Government; and as fast as townships thereafter were surveyed and sectionized, that the State became the owner of the sixteenth and thirty-sixth sections absolutely, not only as to quantity, but as to position also." (*Higgins* v. *Houghton*, 25 Cal. 256; *Doll* v. *Meader*, 16 Cal. 296; *Van Valkenburgh* v. *McCloud*, 21 Cal. 330; *Gains* v. *Nicholson*, 9 How. 364 and 365; *Foley* v. *Harrison*, 15 How. 447; *Kissel* v. *St. Louis Public Schools*, 18 How. 25; *Cooper* v. *Roberts*, 18 How. 179.) " The lines are not ascertained by the survey, but they are created." (*Robinson* v. *Forest*, 29 Cal. 325.) The Commissioner of the General Land Office says: " The approval of the plat is the evidence of the legality of the survey; but in accordance with the spirit and intent of the law, and for the purpose of bringing the settler within its provisions, the land is to be construed as surveyed when the requisite lines are run on the field and the corners established by the Deputy." (1st Vol. Lester's Land Laws, Regulations and Decisions, p. 364.) The approval of the survey relates back to the time of the survey, and the acts should be treated as concurrent. (*Lessieur et al.* v. *Price*, 12 How. 76 and 77.)

The second question is: " Under the laws of the State of California, when are proper applications to purchase lands of

the sixteenth and thirty-sixth sections of the State, legally filed
in the State Surveyor-General's office?"

Sec. 52 of the Act of March 28th, 1868, provides that:

" Whenever any resident of this State desires to purchase
any portion, not less than the smallest legal subdivision of a six-
teenth or thirty-sixth section of any township in this State,
*which has been surveyed by authority of the United States*, he
or she shall make an affidavit, before any officer authorized to ad-
minister oaths, that he or she is a citizen of the United States,"
etc.,    *    *    *    " which application shall be forwarded to the
Surveyor-General of the State."    (Statutes of California of
1867–8, p. 522.)

The Surveyor-General cannot approve any application until
he is officially informed by the proper United States Register
that there is *no valid claim* to the land described therein adverse
to that of the State of California, and this, in case an *adverse
claim being filed*, the said Register cannot do, unless said ad-
verse claim is first heard, adjudicated, and finally disposed of by
the United States Land Department.

In other words, while the State Surveyor-General may (as
the law contemplates he shall) make an immediate application
to the United States Register to select, in behalf of this State,
a certain tract of land in part satisfaction of some one of the
grants made said State by Congress, he may not and cannot
always get an immediate official recognition and approval of
said selection, and his further action in the premises is thus
stayed by matters in the United States Land Department, over
which he cannot exercise control.

There is, therefore, a vast difference between the laws touch-
ing applicants and filing applications to purchase State lands,
and those matters pertaining to the duties of State officers look-
ing to the approval of applications and the sale of State lands,
and the two should not be confounded.

The laws of this State relative to the making and filing appli-
cations to purchase State lands should not be confounded with
the laws *authorizing the approval of such applications*, nor yet
with the laws relating to the issuing of evidences of title based
upon such approvals.    These laws relate to four different classes

of persons, and four different kinds of acts, to be performed by them respectively.

The first relate to applicants and their duties, prescribing the dates when they either must or might file applications to purchase State lands, etc.

The second relate to the State Surveyor-General and his duties, prescribing when he may and when he must not approve such applications, and the disposition of such when approved, etc.

The third relate to the County Treasurers and State Controller and their duties; prescribing when they shall and when they shall not receive and report the payments made and indorsed on such approvals.

The fourth relate to the Register of the State Land Office and to his duties; prescribing when he may and when he must not issue evidences of title based upon such approvals by the Surveyor-General, and payments made thereon to the County Treasurer; so that all these duties as prescribed by law are separate and distinct one from the other.

Why is the filing of a plat of survey in the United States Land Office necessary to enable a party to file an application to the State—the owner of the land—to become the purchaser? The lands are *located, segregated,* by the survey in the field. Their *position* is then known, and the grant immediately attaches. A settler or preferred purchaser may know where he is—that he is on the lands of the State; and is indeed *required* to make his application within three months after the land has been *sectionized,* if he would preserve his rights. (Political Code, secs. 3495 and 3497.) With reference to the thirty-sixth section, an application may be made whenever the *township lines* are established, before the land is even sectionized. (See Parker's Supplement, sec. 8681; also Political Code, sec. 3408.) This certainly is before the filing of any plat in the Land Office. Such applications, when filed, may even be approved, and certificates of purchase issued thereon—all before the land is even sectionized.

Now, this distinction between sections sixteen and thirty-six proceeds upon a principle; and we apprehend that principle to

be this : whenever the township lines are established, the loca-
tion of the thirty-sixth section *is known*, because it is always a
mile square in the southeast corner of the township.   Two of
the section lines having been ascertained by the establishment
of the township lines, and the position of the grant to the State
thus becoming known, the proposed purchaser may put in his
application, which may even be approved and the certificate is-
sued without any further survey.

It is not true of the sixteenth section that its position is known
when the township lines are established.   It is not in the corner
of the township ; on the contrary, is near the middle of the
township, two miles distant from a township line.

But the difference, even while it exists, does not affect the ap-
plication, nor the time at which it may be made.   Some time
must necessarily elapse between the filing of the application
and its approval in all cases when the United States Land
Office must be communicated with ; and the Court will observe
that the lands embraced in Linebaugh's application were located
by the State Surveyor-General, in the United States Land
Office, on the 18th of July, 1873, and that the application was
approved April 16th, 1874.

That it is the settled practice of the State Land Office to en-
tertain applications for the purchase of these lands as soon as
the actual survey is made in the field and approved by the Sur-
veyor-General, is known to every person familiar with such
matters, and has been made to appear in this cause.   If it were
now held that such applications are invalid, half the school-land
titles in the State would probably be destroyed.

*W. C. Stratton*, Attorney for Respondent.

The points made in appellant's brief, and upon which he relies,
are :

First.   That the title to the sixteenth and thirty-sixth sec-
tions vests in the State as soon as surveyed in the field.

Second.   That those sections are dealt with under the land
system of the State, which treats lands as surveyed as soon as
they are sectionized in the field.

I. The instructions of the Commissioner of the General Land Office, of September, 1841, do not say that the public lands are surveyed when the lines are run in the field and the corners are established by the Deputy Surveyor, but that they are to be considered as surveyed at that time for a special purpose.

II. The time when title vests in the State is not material, because the question is not, When could the lands be sold? but, When does the Act of 1868 authorize applications to be made?

III. Applications are to be made for lands within townships which have been surveyed by authority of the United States. (Stats. 1867–8, p. 522, sec. 52.)

IV. Townships are not surveyed by authority of the United States until the Surveyor-General has performed the last act required of him in making the survey, which is the return of the plat to the Local Land Office. (1 Lester, 723.)

I will quote from a brief, filed by Edward R. Taylor, one of appellant's numerous counsel. On page four he says: " Now here we have five separate and distinct facts: first, a survey in the field by the proper officer; second, an approval of the survey by the Surveyor-General; third, the platting of the survey by the Surveyor-General; fourth, the making of a record of the plat in the office of the Surveyor-General; fifth, the filing in the Local and General Land Offices of the record so made."

It will be seen that five different acts are to be performed in making the survey of a township. The first act, the survey in the field, is performed by the deputy—then four other acts are to be performed by the Surveyor-General before he has fully complied with the law in making the survey of a township.

That a township has been surveyed by authority of the United States, when the lines are run in the field by the deputy, before he has made his return, and before he has taken the oath required of him that those surveys have been faithfully and correctly executed according to law, (1 Lester, 315) and before the Surveyor-General, who is charged with the duty of making the survey, has even examined the field-notes, is a proposition not worthy of serious consideration.

The theory of the law is, that applications shall not be made

until after the filing of the plat, when they can take a regular course, and ripen into a title. The several steps follow each other in regular order. The application being filed, the Surveyor-General *immediately* communicates with the United States Land Office. Upon receiving the Register's acceptance of the land, the Surveyor-General approves the application. Upon first payment by the applicant a certificate of purchase issues, and upon full payment a patent.

The object of the act is to sell lands that can be sold, not to invite applications for lands that cannot be sold until a future time; and this Court has decided, in a great number of cases, that applications made before the lands are surveyed confer no rights upon the applicants. That lands are not considered as surveyed under the public land system of the United States until the filing of the plat in the United States Land Office, is admitted by appellant's counsel. Instead of inaugurating a different system, the State has adopted the United States system, and particularly as to the sixteenth sections, requiring that the applications shall be for surveyed lands, and then making it impossible to proceed on the application or take a single step unless the plat be on file; and the law is in conformity to the uniform decisions of the Supreme Court.

That there is, or can be, one system for sixteenth and thirty-sixth sections in place, and another system for lieu lands, is an absurdity, because both are school lands, and are located in satisfaction of the same grant, which is of the sixteenth and thirty-sixth section in each township, the State taking those sections (in place) or selecting other lands in lieu thereof.

It is the applicant's business to see that his application is in due form, and to know that the land he wishes to purchase is the subject of application. The entertaining or approval of an application by the Surveyor-General is no presumption of its validity. ( *Wood* v. *Sawtelle*, 46 Cal. 389.)

This Court has not sustained the settled practice of the State Land Office when not in accordance with law.

It was the "settled practice" of the State Land Office to entertain applications for lieu lands before the filing of the plat, but it was not sustained. ( *C. P. R. R. Co.* v. *Robinson*, 49 Cal. 446, and other cases previously decided.)

It was the "settled practice" of the State Land Office to entertain applications for lands in which the applicant neglected to state in his affidavit that he desired to purchase the land, but the practice was not sustained. (*Hildebrand* v. *Stewart*, 41 Cal. 387.)

That settled practice required the passage of the curative Act of March 29th, 1870.

The "settled practice" of entertaining applications before the filing of the plats does not affect titles, because there is another "settled practice" not to approve the applications filed before survey.

The fifty-second section of the Act of 1868 provides that "whenever a resident of the State desires to purchase any portion of a sixteenth or thirty-sixth section of any township in the State which has been surveyed by authority of the United States, he shall," etc.

The land is not so surveyed until the plat has been filed in the United States Land Office. (*Terry* v. *Megerle*, 24 Cal. 647; *Megerle* v. *Ash*, 33 Cal. 82, 91; *Pope* v. *Atheran*, 42 Cal. 617; *Collins* v. *Bartlett*, 44 Cal. 382; *Hastings* v. *Jackson*, 46 Cal. 239.)

The amendment does not apply to sixteenth sections, and the law as to those sections stood after the amendment as it did before, and Linebaugh's application must be construed as though it (the amendment) had not been made.

No State land system of survey is adopted by the amendment, nor does it intimate that any lands shall be treated as surveyed either before or after the filing of the plat. It is no more than an attempt to authorize the sale of thirty-sixth sections before the land has been surveyed or sectionized in the field, which the Legislature could not do. (*Middleton* v. *Low*, 30 Cal. 596.)

The amendment shows the falsity of appellant's assertion that "no further act of grace is required at the hands of the United States authorities, except to *mark out and designate in the field* where the lands are," for it provides that no patent shall be issued by the State until the location shall have been approved by the United States.

The first proposition of appellant as to the time when title

vests in the State has no application to this case.    There is no
question as to the validity of the law, or as to what the Legis-
lature could.    We do not understand that the State is compelled
to offer lands for sale the moment she acquires title to them, or
at any other time.    Proof that the title is in the State is no evi-
dence that the land is offered for sale.    It only establishes the
fact that it may be offered for sale if the Legislature shall so
provide.

The approved plat of the township in which the land is sit-
uate was not filed in the United States Land Office until after
Linebaugh's application was made; and this Court held in
*Rooker* v. *Johnson*, 49 Cal. 3, that applications made before that
time are invalid.    The facts as disclosed by the findings in the
two cases are much alike.    In the Rooker case, the land in con-
troversy was a part of a sixteenth section; in this case it is also
a part of a sixteenth section.    In that case the township plat
was approved by the United States Surveyor-General in 1863,
and filed in the United States Land Office, June 4th, 1869.

After the approval of the plat, and before it was filed, several
applications were made for the land.    Some were defective, and
some were abandoned; but one, at least, was in due form, and
never was abandoned.    In this case the township plat was ap-
proved in 1861, and filed in the United States Land Office
April 11th, 1873.    Linebaugh's application was made after the
approval of the plot and before it was filed.    It having been de-
cided in the Rooker case that applications made before the filing
of the plat were nullities, the ruling must be applied to this
case.

We respectfully submit that the judgment of the District
Court should be affirmed on authority of *Rooker* v. *Johnson.*
That we think sufficient; but in addition to the point decided in
that case, it is conclusively shown by the findings that whatever
rights Linebaugh had were, in law, abandoned and forfeited be-
fore his application was approved.

By the COURT:

The only material question is the validity of Linebaugh's ap-
plication.    The statute provides: " Whenever a resident of this

State desires to purchase any portion, not less than the smallest legal subdivision, of the sixteenth or thirty-sixth section of any township, *which has been surveyed by authority of the United States*, he shall make an affidavit," etc.

It would seem to have been the practice of the State Land Department, since the passage of the law, to treat as properly filed applications filed at any time after *survey in the field*, and the approval thereof by the Surveyor-General. This practice accords with the natural meaning of the words of the statute, and unless it has been proved to be productive of confusion, or promotive of litigation, or otherwise to conflict with the policy of the law, we see no reason why the Courts should depart from the construction given to the act by those immediately charged with its administration.

The question was not involved in *Rooker* v. *Johnson*, (49 Cal. 3) for no one of the several applications in controversy in that case was made intermediate the survey in the field (the exact time of which did not appear) and the filing of the official plat in the Land Office.

Some of the applications under consideration in that case were filed in 1868, which was before the survey was made in the field. All the other applications were made after June 4th, 1869—the day on which the plat of the survey was filed in the Land Office.

It is apparent, therefore, that the question made here was not presented, and could not have been presented for consideration in that case.

Sec. 12 of the Act of 1868 provides that when an application is made the Surveyor - General shall communicate with the proper United States Land Office, and ask that the land applied for shall be accepted in part satisfaction of the grant to the State, and only after the Register has notified the State Office of the acceptance of the land can the State issue a certificate to the purchaser. The Register may not be able to inform the State Office that he has accepted or rejected the land until after the official survey has been returned to his official custody. The State officer can issue the certificate only after the notice of acceptance, because the State law provides that he shall issue the

certificate only on receiving notice from the Register.     All this does not prohibit the resident from making his application to the State before the approved plat has been filed with the Register. The State may dispose of the land it owns in the present or in expectancy in such manner as the Legislature may deem proper. Whether the application is made before or after the filing of the approved plat, the applicant's right to the *land* depends on the contingency that the Register shall accept it as part of a grant to the State.     When the land has been accepted and the proper State officer notified, it is his duty to issue his certificate to the applicant who first—after approved survey in the field—made application by affidavit in due form.

The " application " by the citizen or resident, and the recognition by the United States officer of title in the State, are not contemporaneous.     From the very nature of the proceedings, the rights of all applicants must remain in abeyance until the application has been accepted by the Register ; then the right to a certificate attaches in favor of the applicant first in time after the *survey.*     No inconvenience, therefore, can arise from according to the statute the meaning heretofore understood by the officers of the State Land Department to be the correct meaning.

The only question here is, which of several applicants was entitled to a certificate, when the State office became authorized to issue a certificate by reason of a notification from the Register that the application for the land had been accepted as portion of a grant to the State.

We find little difficulty in answering.     He who filed first after the *actual survey*—the survey in the field—approved by the Surveyor-General.

We are the more thoroughly convinced that the views above expressed are correct from the circumstances that, under the public land system and practice of the Land Department of the United States, lands have always been treated as *surveyed* when the lines were run in the field, and monuments or marks established by the proper surveyor.

By the Act of Congress of March 3rd, 1853, (1 Lester, p. 207, sec. 6) the general pre-emption law of September 4th,

1841, was first extended over California. (1 Lester's Land
Laws, pages 61 to 63, secs. 10 to 15 inclusive.) This law al-
lowed pre-emptions *only on surveyed lands*, and in the eleventh
section is the following clause: " When two or more persons
shall have settled on the same quarter-section of land, the right
of pre-emption shall be in him or her who made the first settle-
ment."

After this law was passed, it became necessary to settle the
question when lands of the United States should be " treated as
surveyed," and on the 15th of September, 1841, the Commis-
sioner of the General Land Office issued his circulars to Regis-
ters and Receivers of the United States Land Offices, upon this
point as follows: " The approval of the plat is the evidence of
the legality of the survey; but in accordance with the spirit
and intent of the law, and for the purpose of bringing the set-
tler within its provisions, the land is to be considered as sur-
veyed when the requisite lines are run in the field and the corners.
established by the Deputy Surveyor." (1 Lester, page 364.)

Hence, whenever a map of the survey of a township is filed
in the United States Land Office, descriptive field-notes of the
survey of said township are required to be filed with said map
(see 1 Lester, pp. 722–724, for map and instructions); and in
case a contest arises between two settlers who settled on the
land after the survey and before the map was filed in the Land
Office, the Register and Receiver can refer to the map and de-
scriptive field-notes, and ascertain when the land was surveyed
in the field, and which of the two settlers first settled after said
survey in the field, so as to award the land to the first settler,
in accordance with the eleventh section of the Act of September
4th, 1841, and the Commissioner's instructions of September
15th, 1841. (1 Lester, 364.)

The seventh section of the Act of Congress of May 30th, 1862,
(2 Lester, p. 48) has the following: " That in regard to set-
tlements which, *by existing laws*, are authorized in certain States
and Territories upon unsurveyed lands, which privilege is here-
by extended to California," etc.

In the existing laws referred to above are the following:
" That if, when said lands are *surveyed*, it is found that two or

more persons have settled upon the same quarter-section, each shall be permitted to enter his improvement, as near as may be,. by legal subdivision." (1 Lester, 238, No. 255.) Here, then, the Register and Receiver have to refer to the map and descriptive field-notes of said land, to see if both or all of said settlers, claiming the same quarter-section of land under said law, actually settled before the survey of the land in the field, or if one or more of them did not actually settle after the survey of the land in the field, when the lines and corners of the sections were clearly defined on the ground, and, as a consequence, whether their settlement was not in violation of law, and a fraud on the first settler who actually settled before the survey of the land in the field.

The Act of Congress of February 26th, 1859, has the following: "That where settlements, with a view to pre-emption, have been made *before the survey of lands in the field,* which shall be found to have been made on sections sixteen or thirty-six, said sections shall be subject to the pre-emption claim of said settler," etc. (11 U. S. Stats. 386 ; 1 Lester, 306–308, No. 353.)

In Zabriskie's Land Laws of the United States is the following: "The State acquires a right to all the sixteenth and thirty-sixth sections immediately after such survey *in the field* has been made as will enable a person to determine the locality of said sections." (Pages 493–494.)

In the General U. S. Land Office Report for 1871, on page 35, is the following : " As soon as, in running the lines of the public surveys, the school sections *in place* are fixed and determined, the appropriation thereof for the educational object is, *under the law,* complete, except where they are found to be covered by prior adverse rights."

Thus it will be seen that under the law and the instructions of the Commissioner of the General Land Office, and the practice of the Land Department of the Government of the United States, lands are treated as surveyed "*when the requisite lines are run in the field, and the corners established.*"

We think that the conclusion of the Court below, that the application of Linebaugh was void, was erroneous.

Statement of Facts.

Judgment reversed and cause remanded.
Remittitur forthwith.

Mr. Justice CROCKETT and Mr. Justice RHODES dissented.