Hudson, J.
This action was brought by the plaintiff, the Northern Pacific Railroad Company, to recover the possession of a certain piece of land, situate within the limits of the city of Fargo, occupied by the defendant.
The title relied upon by the plaintiff to. maintain the action, is derived from the United States, by virtue of a grant of land to aid in the construction of a railroad and telegraph line by plaintiff from Lake Superior to Puget Sound, on the Pacific Coast, by the Northern route: Act of July 2nd, 18G4, Yol. 13, U. S. Statutes at Large, p. 365. In and by said act, after granting right of way, etc., in section one, section 2, provides as follows: ****** “ The United States shall extinguish, as rapidly as may be eonT “ sistent with public policy and the welfare of the said Indians, “ the Indian titles to all lands falling under the operation of this “ act and acquired in the donation to the froadl named in this “ bill.”
“ .Siso. 3. And le it further enacted, That there be, and hereby “ is, granted to the Northern Pacific Railroad Company, its suc- “ cessors and assigns, for the purpose of aiding in the construction “ of said railroad and telegraph line to the Pacific Coast, and to “ secure the safe and speedy transportation of the mails, troops, “■munitions of war and public stores over the route of said line of “ rail-way, every alternate section of public land not mineral, desig- “ nated by odd numbers, to the amount of twenty alternate sections “ per mile on each side of said railroad line, as said company may “ adopt, through the territories of the United States, and ten alter- “ nate sections of land per mile on each side of said railroad when- “ ever it passes through any state and whenever on the line thereof, “ the United States have full title,- not reserved, sold, granted, or “ otherwise appropriated and free from pre-emption or other claims “ or rights at the time the line of said road is definitely fixed and *225 “ a plat thereof filed in the office of the Commissioner of the Genii eral Land Office; and whenever prior to said time any of said “ sections or parts of sections shall have been granted, sold, reserved, “ occupied by homestead settlers, or pre-empted, or otherwise dis- “ posed of, other lands shall be selected by said company in lieu “ thereof, under the direction of the Secretary of the Interior.” * * * * * * * ******
“ Sec. 6. And be it further enacted, That the President of “ the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after “ the general route shall be fixed, and as fast as may be required “ by the construction of said railroad; and the odd sections of land “ hereby granted shall not be liable to sale or entry, or pre-emption “ before or after they are surveyed, except by said company, as pro- “ vided in this act; but the provisions of the act of September, “ eighteen hundred and forty-one, granting pre-emption rights, “ and the acts amendatory thereof, and of the act entitled £An act ££ to secure homesteads to actual settlers on the public domain,’ ££ approved May twenty, eighteen hundred and sixty-two, shall be, ££ and the same are hereby extended to all other lands on the line ££ of said road, when surveyed, excepting those hereby granted to ££ said company. And the reserved alternate secti-ns shall not be £< sold by the government at a price less than two dollars and fifty ££ cents per acre, when offered for sale.”
It has been repeatedly held that by the terms employed in this act, the title in fee in the land vested in the grantee, subject to the right of occupancy by the Indians. It was also subject to the conditions subsequent, imposed by the act. It was an absolute grant but in the nature of a contract by which both parties to it agreed to perform certain acts. If Congress had the power to dispose of the public lands (and this power at this day will hardly be doubted) all the title the United States had was vested in the railroad company, subject to the conditions to be performed on its part. There *226 is no provision in this act, by which the lands were to revert to the grantor in case of a failure to perform these conditions. The title to the land would be unaffected by such failure until Congress should see fit to enforce a forfeiture. The words used are terms of present grant; but at the time this act was passed, that portion of the grant lying west of the Bed River, embracing the land in this contention, was Indian territory, in the possession of the Walipeton and Sisseton bands of Indians; hence the act provided that the United States should extinguish, as rapidly as consistent with public policy and the welfare of the Indians, their title to all the lands falling under the operation of the act.
It was insisted on the argument by the learned counsel for the defendant, that these lands being in the possession of the Indians, were excepted from the grant because the United States did not have full title within the language of section 3 of the act; that it cannot be presumed that Congress granted land to which others had pre-existing rights. That is very true in case there is nothing to show a different intent; but it is very evident from the provisions of this act, that Congress did intend to grant lands to which the Indians had the right of occupancy; otherwise it would not have provided for the extinguishment of their title. Indeed if no land was granted by this third section, subject to the Indian title of which they had possession, the railroad company get but very little by the grant, and its object, as declared in the act, would be most essentially defeated, for ■ the reason that there was at that time no other than Indian land along the line of this proposed road, in the Territory of Dakota. The following clause in section three is referred to as limiting the grant and supporting the construction of the defense: “ Whenever on the line thereof, the United States have full title not reserved,” etc., “ at the time the line of said road is definitely fixed and a plat thereof filed in the G-eneral Land Office;” but it should be borne in mind that this was an executory contract; it was as if Congress had said, when *227 we get full title to this land, the general route of the road being fixed, it shall vest absolutely in the railroad company. To carry out this agreement, and to get full title it was provided that the Indian title should be extinguished as rapidly as possible, etc., with this intent; and that other claims should not attach, it was provided that as soon as the general route of the road should be fixed, the land should be surveyed and the odd sections should not be liable to sale, pre-emption, etc.; and this in anticipation of the extinguishment of the Indian title. The land was as clearly defined as it could be; clearly it was Indian lands — not that Congress intended to ignore the rights of the Indians, but respecting them, agreed to acquire their rights, of course, in an honorable way. Such, it seems to us, is the fair construction to be given to that clause in the act. This extinguishment was effected by a treaty with the Indians, signed and executed on the 2nd day of May, 1873. On that day the title became perfect in the government, and when the line of said road was definitely fixed by the building of the road and filing the plat thereof in the office of the Commissioner, vested in the grantee. The plaintiff having acquired a complete title and right of possession to this land, is entitled to recover upon that title, unless the defendant can show a prior or better right. This he seeks to do by showing a preemption right which, it is alleged, attached to the land prior to the title of the plaintiff. He alleges, that having the. qualifications of a pre-emptor, he entered upon the land and attempted to comply with the act of September, 1841, section 2259 of which provides that every person (having certain qualifications) “ who has “ made, or hereafter makes, a settlement in person on the public “ lands subject to pre-emption, and who inhabits and improves “ the same, and who has erected or shall erect a dwelling thereon, “ is authorized to enter with the register of the land office for the “ district jn which such land lies, by legal subdivisions, any num- “ ber of acres, not exceeding one hundred and sixty, or a quarter *228 “ section o£ land, to include the residence of such claimant, upon “ paying to the United States the minimum price of such land.”
It seems not to be disputed that the defendant had the qualifications of a pre-emptor required by this law. And the record shows that on the 5th day of October, 1871, he settled on the land and improved it — built a small dwelling house and continued to reside thereon up to the time this suit was commenced; that the plaintiff at the time of such settleinent was at work on its right of way, laying its track across said piece of land so settled upon by defendant within about ten rods of his dwelling; that on the 28th day of July, 1873, the defendant signed, and on August 11th following, presented his declaratory statement to the register and receiver of the land office at Pembina, which was the proper office, declaring his intention to claim the said land as a pre emption, under the said act of Congress, alleging settlement October 5th, 1871. The description of land in said declaratory statement was as follows: The north half of the northwest quarter and the northwest quarter of the northeast quarter and lot 1 of section 7, township 139, range 48, subject to sale at the land office at Pembina, in the Territory of Dakota, containing 150.95 acres. The said line of road traverses this piece of land from east to west. This statement was presented within three months after the township plat was filed in which it was situated. The register and receiver refused to permit the defendant to file said declaratory statement and to pre-empt said land, for the reason, as they stated, that they had been instructed to withhold said land from sale; that the lands therein described were railroad lands. From this refusal of the local land officers the defendant appealed to the Commissioner of the General Land Office. And from the decision of the Commissioner affirming the decision of the local officers, to the Secretary of the Interior, who affirmed the decision of the Commissioner. A nd the defendant has not at any time taken any other or further steps to secure his rights as a pre-emptor, but in his answer in *229 this action alleges that the decision of the Land Department was erroneous and prays that such decision be reversed.
¥e now come to the principal question involved in this controversy, and upon which it turns — namely, was this land at any time public land subject to pre-emption, so that the defendant could acquire any rights as a settler, or a pre-emptor, upon it?
The plaintiff having commenced work on its right of way in 1871, and continued from that time, and having filed a map of the general route of said line from the Red River to the James River and across this land in February, 1872, in the office of the Secretary of the Interior, it became the duty of the President of the United States to cause a survey of the land. This authorized the withholding of the same from sale, entry, or pre-emption, by the officers of the Department of the Interior, as provided in section six of the act. This provision had that effect, without further notice; but it was so formally withheld by notice. Thus the government undertook to perform, and did perform strictly, all that the act provided should be done to secure to the defendant that which it contracted for. This was a mutual contract; the government had an interest in it, and in its performance on the part of the railroad company.
Section three declares that beyond giving aid to the railroad, the purpose was “ to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores over the route of said line of railway.” It had an interest also in the enhanced value of the public lands in the vicinity of the road. Therefore it was perfectly competent for Congress to provide, (to secure these objects) that the odd sections falling within the operation of the act, be withheld from sale or pre-emption, that the grant might be effective. They were thus set apart from the public domain so that no subsequent act or law of the government could be construed to embrace them., although not specifically excepted. All *230 that afterwards remained for the United States to do with respect1 to them, and all that could be done under this compact was to identify the sections by appropriate surveys: Beecher v. Wetherby, 5 Otto, 524; Wilcox v. Jackson, 13 Peters, 508. After such appropriation the government was not at liberty to sell them, and any other disposition by sale, or otherwise, would be void: Kessell v. Board of Public Schools, 18 How., 19; Chatard v. Pope, 12 Wheaton, 587. After the filing of the map of the general route and the lands surveyed, the odd sections were not for sale or pre-emption; and when the Indian title was extinguished by the ratification of the treaty between the United States and the tribes then occupying them, the provisions of section six of the act became effective and no pre-emption rights could be acquired thereafter.
It is not claimed that the defendant could acquire any right before, not even to be regarded as a settler, and there was no interval after the extinguishment when these lands were subject to sale, so that no right could attach at any time; hence the status of the defendant did not bring him within section 2281 of the Revised Statute, and constitute him a settler, nor within the provisions of the act of July 2, 1864.
Should there be any doubt in the minds of any as to the lairds that were actually withheld by the department, reference is had to the letter of instruction of the Commissioner of the General Land Office, to the local officers. The material part is as follows:
“ Department of the Interior, General Land Office, )
“ Washington, D. 0., March 30, 1872. j

“Register and Receiver, Pembina, Dakota Territory:

“' Gentlemen: — I transmit herewith diagram showing the desig- “ nated route of the Northern Pacific railroad, under act of July “ 2, 1864, and by direction of the Secretary of the Interior, you “ are directed to withhold from sale or location, pre-emption' or “ homestead entry, all the sur'veyed.and unsurveyed odd numbered *231 “ sections of public lands falling within the limits of forty miles, “ as designated on this map. ********** “ This order will take effect from the date of its receipt by you.
“***** (Signed,) W. W. Curtis, “ ■ . Acting Commissioner.”
It is quite immaterial to this action when the plaintiff acquired title to this land, only that it was before this action was brought. There was no strife between the plaintiff and defendant, as contended for by counsel, as to priority of right, because the land was not at any time subject to pre-emption. It is quite true that a person may enter upon public lands not yet subject to entry and make improvements; and if the land is subsequently declared to be open to sale and pre-emption, if his settlement is followed up by the other steps, he may get title, but he' takes the risk of its being withheld from sale or appropriated to some other purpose. Tie acquires no right by his settlement as against the United States. All the right any such settlement would give would be the right to enter the land in preference to another settler coming after, in case the land became open to' sale. The question of priority then would be of some importance between two such.settlers for entry or pre-emption. The rule of first in time, first in right, would apply: Frisbie v. Whitney, 9 Wall., 187; the Yosemite Valley Case, 15 Wall., 77; Shepley et al. v. Cowan et al., 1 Otto, 338.
The government undertook to grant these lands to the railroad company before the defendant or any white man had settled upon them, and it used all the means in its power to make the grant effective and to prevent any person from acquiring rights in them except the railroad company. It never consented by any act of Congress or of the Land Department to sell them to anybody else, but always refused to do so, and it would be marvelous if the defendant should be able to defeat this attempt in spite of all.
Much stress is laid upon the. language of section 6 of the act *232 granting this land, excepting and protecting ■ the rights of settlers, pre-emptors and others; but it is very clear that bona fide settlers and pre-emptors are to be thus protected, which this defendant was not and eould not be.
The passage of this act was constructive notice to all the world that this land was appropriated to the purposes of this railroad; that the odd numbered sections would be withheld from sale and pre-emption as soon as the land was surveyed, and the even numbered sections put in the market at $2.50 per acre when the general route was fixed. The act so declares, and as a matter of fact, this was done long before the Indian title was extinguished. The road was built across the land in question while the defendant was a mere trespasser. These facts all came to the personal knowledge of the defendant who Was on the ground. He presented his de-cl aratory statement to the land office at Pembina with the full knowledge that his improvements were on an odd numbered section which was not subject to pre-emption and never had been. In any view we can take of this case, we cannot see that the defendant has any valid claim or right to this land. Judgment of the District Court is,
Affirm kd.
All the Justices concurring.